## FIELDS v. UNITED STATES.
### No. 9486.

United States Court of Appeals
District of Columbia.
Argued June 9, 1947.
Decided Oct. 27, 1947.

Writ of Certiorari Denied Jan. 12, 1948.
See 68 S.Ct. 355.

See, also, 6 F.R.D. 203.

Mr. William B. Mahoney, pro hac vice, by special leave of court, of Buffalo, N.Y. with whom Messrs. Alton S. Bradford and I. Irwin Bolotin, both of Washington, D.C., were on the brief, for appellant.

Mr. William Hitz, Asst. United States Atty., of Washington, D. C., with whom Messrs. George Morris Fay, United States Atty., Charles B. Murray, Asst. United States Atty., and Sidney S. Sachs, Asst. United States Atty., all of Washington, D. C., were on the brief, for appellee.

Before EDGERTON, C L A R K and PRETTYMAN, Associate Justices.

CLARK, Associate Justice.

Appellant was convicted by the verdict of a jury in the District Court of the United States for the District of Columbia under an indictment charging him with violation of 52 Stat. 942, Act June 22, 1938, 2 U.S.C. A. § 192 which reads as follows: "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress,

willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months." He appeals from the judgment of conviction.

On August 8, 1946, a subpoena was issued summoning appellant to appear before the select committee of the House of Representatives, created by authority of H. Res. 385, 79th Congress (1946), to investigate the disposition of surplus property. In obedience to said subpoena appellant appeared before the committee on August 12, 1946, and was sworn as a witness. Appellant was thereupon questioned at some length in connection with a transaction in which he had participated whereby a quantity of bronze wire screen purchased by appellant and his business associates from the War Assets Administration was resold to an Oklahoma company at an unusual profit. During the course of his testimony appellant professed his willingness to provide the committe with all of the records in his possession pertaining to this particular transaction, and appellant did hand over to the committee at this time a file of papers relating to this transaction.

The committee member to whom appellant had handed this file discovered therein a typewritten memorandum, which was received in evidence at the trial below, in the following form:

### Bronze Wire Screening

Gross Profit .................. $4,442.80

Less:

Brokerage, 1/3 to
Glenn A. Dies.... $1,480.93
Brokerage, 1/3 to
John Doe ....... $1,480.93
Brokerage to John
Doe ........... $ 400.00
Traveling and Misc.
Expenses ...... $ 100.00
———— 3,461.86

Net Profit ............. 980.94

As a consequence of this discovery appellant was then asked if he had any records which would amplify the memorandum and serve to identify the persons therein described merely as "John Doe." Appellant answered with an explanation that most of his records were then in the hands of his auditor, that he thought he could produce the records requested, and would like to have an opportunity to do so. In pursuance of its request the committee caused to be issued and served upon appellant a subpoena duces tecum, returnable August 13, 1946, directing him to "* * * bring with him all books, records, documents, memoranda, notes, ledger sheets, cancelled checks (i. e. Brokerage, 1/3 payable to Glenn A. Dies, $1,480.93; Brokerage, 1/3 payable to John Doe, $1,480.93; Brokerage payable to John Doe, $400.00), and other evidence of payments, and other material relating to or connected with the sale of 539 rolls of bronze mesh screen wire."

On August 13, 1946, appellant requested of the committee that he be allowed to delay his appearance as directed by the subpoena duces tecum for one day, and this request was granted. On August 14, 1946, appellant appeared before the committee at 10 a.m. without additional records, and explained that his auditor was trying to secure the records for him that day, and further that he believed the records could be made available later in the day. Whereupon appellant was excused by the committee until 2 p.m. the same day, with instructions to appear at that time with the subpoenaed records. Appellant did appear at the later time, but without additional records, and testified, when questioned with regard to the whereabouts of the papers called for by the subpoena, "I have given you all I have."

With remarkable forbearance the committee twice again excused appellant to allow him additional time to produce the records requested. During his final appearance before the committee on August 15, 1946, appellant, having yet failed to produce the subpoenaed records, was asked the following question by the committee chairman: "Do you this morning have with you, in obedience to the subpoena served on you August 13, 1946, all books, records, documents, memoranda, notes, ledger sheets, canceled checks, in connection with the

matter in which, according to your memorandum one-third commission was payable to Glenn A. Dies, in the sum of $1,480.93, plus one-third payable to John Doe, in the sum of $1,480.93, plus brokerage payable to John Doe in the sum of $400.00, or any other evidence of payments to these two individuals indicated as John Doe?" In reply appellant answered: "Mr. Chairman, I have brought to this committee all of the evidence, all of the files, and all of the books in connection with bronze wire that I possess. There are no other records until such time as the auditor sets them up from a memorandum which I furnish him. If I had any other records I would be very happy to bring them to this committee."

For his failure to produce the records called for by the subpoena appellant was cited by the House of Representatives, upon the recommendation of the committee, for contempt. The indictment returned by the grand jury contained two counts of alleged contempt, similar in substance but referring to the separate days of August 14 and 15, 1946. The lower court granted a motion for acquittal as to the first count but appellant was convicted on the second count. He was sentenced to be confined for a term of three months and to pay a fine of two hundred and fifty dollars.

The Government charged there were at least three documents pertinent to the transaction under investigation by the committee which were available to the appellant at the time of the committee hearing. These documents were produced at the trial. The jury found that one or more of these documents had been willfully withheld from the committee by the appellant.

The principal issues raised on appeal are whether or not the court below erred in failing to direct a judgment of acquittal as to the second count; whether or not the word "willfully", as used in the statute, implies an evil or bad purpose; and the related question of whether or not good faith has any bearing on the issue of willfulness.

The last two issues arise from the court's charge to the jury that an evil or bad purpose is immaterial, and the court's refusal to charge that appellant's acts assertedly constituting good faith had a bearing on the issue of willfulness.

■ As to the first issue we are of the opinion that the evidence presented by the Government was clearly sufficient to warrant submission of the case to the jury.

■ Appellant contends that the word "willful" has a meaning which includes an evil or bad purpose when used in a criminal statute. We think the term has acquired no such fixed meaning according to the type of statute in which it is employed. The Supreme Court has said, long ago, "In construing a statute, penal as well as others, we must look to the object in view, and never adopt an interpretation that will defeat its own purpose, if it will admit of any other reasonable construction." The Emily and The Caroline, 1824, 9 Wheat. 381, 6 L. Ed. 116.

A legislative committee of inquiry vested with power to summon witnesses and compel the production of records and papers is an institution rivalling most legislative institutions in the antiquity of its origin.[1] One of the earliest instances of the exercise of this power is found in Sir Francis Goodwin's Case in 1604, wherein authority was delegated to a parliamentary committee to summon particular witnesses and to require the production of records.[2] Prior to the adoption of our Constitution colonial assemblies frequently assumed authority to punish for contempt any person who refused to appear in answer to a summons or who failed to disclose information required for the effective administration of government. After the Constitution was adopted Congress assumed this power. In 1792 it appointed an investigating committee "to call for such persons, papers, and records, as may be necessary to assist their inquiries."[3] From that date to 1929 Congress

---

[1] See Landis, Constitutional Limitations on Congressional Power of Investigation, 40 Harv.L.Rev. 153 (1926), and Potts, Power of Legislative Bodies to Punish for Contempt, 74 U. of Pa.L.Rev. 691 (1926), for a full discussion of historical background.

[2] 2 Howell, State Trials, 91, 101 (1816), Hale, Original Institution, Power and Jurisdiction of Parliaments, 105 (1707).

[3] 3 Annals of Congress 490-94 (1792).

authorized over three hundred investigations to assist the performance of its several functions.[4] Since that time Congress has made abundant use of investigating committees, a natural consequence of the expanding scope of legislative concern with administration.

■ Such a brief reference to the historical background of congressional investigating committees is sufficient to support the premise that Congress was only implementing a conceded power when it enacted the statute[5] providing punishment for contempt of such committees.[6] The statute only serves to supplement the contempt power implied to the Houses of Congress, the enforcement of which, prior to the enactment of the statute, involved a procedure which was cumbersome and troublesome. Its objective was to facilitate the gathering of information deemed pertinent to the purpose of an investigating committee.

■ The apparent objective of the statute involved here would be largely defeated if, as appellant contends, a person could appear before a congressional investigating committee and by professing willingness to comply with its requests for information escape the penalty for subsequent default. This court said, in Townsend v. United States, 1938, 68 App.D.C. 223, 229, 95 F.2d 352, 358: "The meaning of the word [willful] depends in large measure upon the nature of the criminal act and the facts of the particular case. It is only in very few criminal cases that 'willful' means 'done with a bad purpose.' Generally, it means 'no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law.'" (Quoting Learned Hand, J., in American Surety Co. v. Sullivan, 2 Cir., 1925, 7 F.2d 605, 606.) At the trial of this case the court said, in its charge to the jury: "The word 'willful' does not mean that the failure or refusal to comply with the order of the committee must necessarily be for an evil or a bad purpose. The reason or the purpose of failure to comply or refusal to comply is immaterial, so long as the refusal was deliberate and intentional and was not a mere inadvertence or an accident." We uphold that differentiation in our view of the purpose of the statute.

■ Closely related to the issue of willfulness is appellant's assertion of error in the trial court's refusal to charge that appellant's voluntary production of certain records constituted evidence that he acted in good faith and did not "willfully" default. Such an assertion does not penetrate the question whether or not appellant was guilty of deliberately failing to produce subpoenaed records subject to his control, and it was the alleged failure to do so that served as the basis for the contempt citation. That question of fact was properly referred to the jury in the trial below, and the jury returned a verdict against the appellant.

■ One other contention raised by appellant deserves brief consideration. It is asserted that the trial court erred in permitting the Government to treat its witness, John Brunner, as hostile, and thereby authorizing cross-examination of this witness by Government counsel. Brunner was, at the time of the bronze wire screen transaction, and at the time of the committee investigation, a business associate of appellant. Government counsel represented to the trial court that Brunner was a hostile witness, whereupon permission was given for cross-examination. The right to grant such permission was within the sound judical discretion of the trial judge. Holmes v. United States, 1926, 56 App.D.C. 183, 11 F.2d 569. See Wigmore on Evidence, 3d Ed., § 896 et seq. We see no reason compelling a belief that it was in this case improvidently exercised. It was not inconsistent to treat this witness as hostile, for the evidence adduced by his testimony was of real probative value in deducing deliberate and intentional action on the part of the appellant, without regard to whether or not

---

[4] Dimock, Congressional Investigating Committees in 47 Johns Hopkins University Studies in Historical and Political Science (No. 1) 147 (1929).

[5] The statute under discussion was originally enacted in 1857, 11 Stat. 155, and remains substantially unchanged as stated, supra.

[6] See Jurney v. MacCracken, (1935), 294 U.S. 125, 151, 55 S.Ct. 375, 79 L. Ed. 802.

appellant had an "evil purpose." Brunner was a parolee at the time of the screen transaction and at the time of the committee investigation, whose terms of parole prohibited his engagement in speculative enterprises. Even if it were believed that appellant may have attempted to protect Brunner by withholding divulgence of the latter's participation in the screen transaction, appellant's purpose may as well have been philanthropic as evil. But for whatever purpose the records were withheld it was only necessary to show that the withholding was deliberate and intentional.

In conclusion, we have carefully examined the record on appeal and find in it no reversible error. Accordingly, the judgment of the trial court is

Affirmed.