**BART v. UNITED STATES.**

No. 11045.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 6, 1952.

Decided Dec. 19, 1952.

Petition for Rehearing Denied
April 15, 1953.

James T. Wright, Washington, D. C., for appellant.

John D. Lane, Asst. U. S. Atty., with whom Mr. Charles M. Irelan, U. S. Atty., Joseph M. Howard, Asst. U. S. Atty., Washington, D. C., and Charles B. Murray, Asst. Atty. Gen., were on the brief, for appellee. George Morris Fay, U. S. Atty., Washington, D. C., when the record was filed, also entered an appearance for appellee.

Before PRETTYMAN, PROCTOR and BAZELON, Circuit Judges.

PRETTYMAN, Circuit Judge.

Philip Bart was indicted in thirty-two counts for refusal to answer that number of questions asked him by a Subcommittee of the Committee on Un-American Activities of the House of Representatives. Before or during the trial the Government abandoned twenty-four of the counts. Bart was convicted upon the first eight counts of the indictment. From that conviction he appeals. The counts, and the questions involved in them, require somewhat different consideration and disposition.

Counts One and Two rest upon questions described thus: "Whether the defendant was born under the name of Philip Bart" and "When the defendant took the name of Philip Bart." It seems clear that Bart answered those questions. Without attempting to recite all the incidents in the record, it is sufficient that we quote this one:

"Mr. Walter [Chairman of the Subcommittee]: When did you legally change your name?

"Mr. Bart: Many years ago.

"Mr. Walter: Where?

"Mr. Bart: In the city of New York.

"Mr. Walter: Did you have your name changed in court?

"Mr. Bart: Yes; about 15 years ago."

The next four counts of the indictment involved questions described as follows:

### Count Three.

"What was the name of the defendant when he came to the United States."

### Count Four.

"What was the defendant's father's name."

### Count Five.

"Under what name did the defendant's father become a citizen of the United States."

### Count Six.

"What name did the defendant change his name from."

When Bart was asked these questions by the Subcommittee he did not answer but, instead, each time made reference to a statement already made. For example, when he was asked what his father's name was, he said, "I have already dealt with this question." This was apparently a reference to an earlier statement that "I will not answer it because it is not pertinent to the hearing." After these four questions had been asked him, he said, "My answer is that I have answered what my name is here, which is the only question pertaining to the inquiry, it seems to me." It appears, therefore, that Bart took the position that these four questions were not pertinent to the inquiry.

Upon the oral argument in this court, counsel for Bart abandoned the point that these questions were not pertinent. So the controversy now posed concerns naked refusals to answer; that is, refusals without asserted legal justification. Counsel takes the position that prosecution for contempt will not lie for refusal to answer these questions, because Bart was not directed by the Committee to answer after he had once

48

refused. He says that ever since Chief Justice Marshall's procedure in the Burr case[1] the courts have universally followed the practice of directing a witness to answer after the initial refusal to answer. He says that this is a universally accepted principle of law, founded in common sense, and applies to inquiries by congressional committees. He cites United States v. Eisele,[2] Graham v. United States,[3] and May v. United States.[4] But the Eisele case dealt with immunity from prosecution for testimony given after the witness had claimed the constitutional privilege against self-incrimination; the Graham case dealt with a claim of the privilege and, principally, the duty of a trial court to pass upon the incrimination involved; and the May case involved voluntary testimony. Those cases are not pertinent here.

We have held in Emspak v. United States, 91 U.S.App.D.C. 378, 203 F.2d 54, decided today, that there is no requirement that a specific direction to answer be given after a refusal to answer. Emspak's contention was directed to the necessity for a specific direction to answer after an asserted claim of the privilege against self-incrimination. It was clear upon the record, certainly as to some of the questions, that Emspak was made indisputably aware of the attitude of the Subcommittee toward his refusals and his grounds for the refusals; indeed his counsel made no contrary contention in that respect. In the present case the basic problem recurs in a different framework. For that reason we add to the discussion in the Emspak case.

Bart's argument in reliance upon the cases he cites (Eisele, Graham and May) is confused as to the issue here. In the first place it confuses the present problem with the problems of immunity from prosecution and the admissibility of testimony. The constitutional guaranty with which those cases were concerned (Amendment V) is that no person shall be compelled to testify against himself in a criminal case. As we pointed out in May v. United States, supra, the problem presented by that guaranty involves two conflicting interests, the right of the witness to refuse to answer and the importance to the public of the information sought. When the privilege is claimed by a witness it is the inquirer's duty "to determine whether he wishe[s] to exchange immunity for testimony."[5] If an inquirer wants information despite its unavailability against the witness, he must have authority to grant complete immunity to the witness. He exercises that authority by compelling the witness to answer. But it happens that Congress has not empowered its committees to grant the necessary immunity,[6] and so they have not the power to compel incriminating evidence. Therefore, a witness before them is not in contempt if he refuses to answer in reliance upon the privilege, even after a specific direction to answer; provided that his claim to the privilege is valid, a matter which we shall discuss in a moment, and further provided that he has not waived the privilege after asserting it. Under present statutes relating to congressional committees, a direction to answer, conveying no immunity, has no effect one way or the other upon the witness's liability for contempt, except in so far as it serves to make certain that the witness intends to refuse.

The Congress has empowered other inquirers, for example, the Securities and Exchange Commission, to give immunity.[7] In such cases a witness is in contempt if he refuses to answer an incriminating question after being specifically directed to answer. The direction to answer after an assertion of the privilege conveys immunity.

Bart's argument upon the above-cited cases also confuses the problem of a specific

1. United States v. Burr, C.C.Va.1807, 25 Fed.Cas. 38, No. 14,692e.

2. D.C.D.C.1943, 52 F.Supp. 105.

3. 9 Cir. 1938, 99 F.2d 746.

4. 1949, 84 U.S.App.D.C. 233, 175 F.2d 994, certiorari denied, 1949, 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505.

5. Phrase quoted from United States v. Eisele, supra note 2, 52 F.Supp. at page 108.

6. United States v. Bryan, 1950, 339 U.S. 323, 335–336, 70 S.Ct. 724, 94 L.Ed. 884.

7. United States v. Eisele, supra; 48 Stat. 900 (1934), 15 U.S.C.A. § 78u(d).

direction to answer with the problem of deliberate intent to refuse to answer. As we pointed out in Townsend v. United States[8] and repeated in Fields v. United States,[9] the offense of contempt for refusal to answer is a deliberate and intentional refusal and not an inadvertence, an accident, or a misunderstanding. If a witness interposes an objection or query to the propriety of a question, e. g., its pertinency, he may not be refusing to answer. In such event both elementary justice and statutory provision require that he be made aware, by some method at some time, that despite his position the inquirer means that he shall answer the question. That requirement is not for a specific direction, in terms, to answer; it may be in a preliminary[10] or a subsequent statement[11] or in a repetition of the question.[12] If the actual questioner be counsel instead of the inquiring authority, or a member of it, the attitude (i. e., the acceptance or non-acceptance of the refusal upon the grounds presented) of that authority may be made clear by prior announcement or by acquiescence or ratification. That phase of the matter must be determined from the circumstances.

Whether a witness means to refuse to answer is a question to be determined from all the circumstances. Like the element of intent in every criminal case it is a question of fact, determinable by the jury, if there be a jury, under appropriate instruction and definition by the court. A specific direction to answer is undoubtedly the better, more just practice and the one most likely to make certain whether the witness is intentionally refusing. We are told that the committees and subcommittees of Congress are now pursuing that course. But the problem before us concerns necessity, not merely desirability. A specific direction to answer is not necessary; intent to refuse to answer is necessary.

In United States v. Murdock[13] the Supreme Court ruled that an authoritative determination upon an asserted right to refuse to answer is not a necessary prerequisite to a prosecution for willful failure to answer. The Court said: "By the very terms of the definition the offense is complete at the time of such failure." Conviction for contempt was there affirmed. The record showed that the inquirer gave no direction to answer after the refusal, but it also showed that Murdock was made fully aware, in an extended discussion before the refusals, of the intentions of his questioners and of the consequences of refusal to answer their contemplated questions.

█ If a witness flatly and without purported explanation, justification or excuse refuses or fails to answer a question, there is no necessity to repeat the question, or to coax him, threaten him, persuade him, or press him. A witness duly subpoenaed and sworn is presumed to know the elementary requirements of compliance and the corresponding dangers of refusal to answer.

A witness does not insulate himself from contempt by asserting a reason for a refusal to answer, or by objecting to the question, or by querying its propriety. When he deliberately and intentionally refuses to answer upon a stated ground, he assumes the risk that the ground is unsound. This was the holding of the Supreme Court in the Sinclair case.[14] If he refuses to answer because he says the answer would incriminate him, or says the question is not pertinent, or says that the question is improper because violative of First Amendment guaranties, he assumes the risk that a court in a later proceeding may find that his stated reason was not valid, that the answer would not tend to incriminate him, or that the question was pertinent or was not violative of any con-

---

8. 1938, 68 App.D.C. 223, 229, 95 F.2d 352, 358, certiorari denied, 1938, 303 U.S. 664, 58 S.Ct. 830, 82 L.Ed. 1121.

9. 1947, 82 U.S.App.D.C. 354, 357, 164 F. 2d 97, 100, certiorari denied, 1948, 332 U.S. 851, 68 S.Ct. 355, 92 L.Ed. 421.

10. See Sinclair v. United States, 1929, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692.

11. See discussion infra.

12. See Emspak v. United States, supra.

13. 1931, 284 U.S. 141, 148, 52 S.Ct. 63, 76 L.Ed. 210.

14. Supra note 10.

stitutional guaranty. As the Supreme Court pointed out in Rogers v. United States,[15] the court must determine in every case in which the privilege against self-incrimination is claimed "whether the question presented a reasonable danger of further crimination in the light of all the circumstances". And to the same effect is Sinclair v. United States, supra, relating to pertinency. In both those instances the Court affirmed convictions for contempt, the witness being held to be in error in his asserted ground for refusal.[16]

█ It is true that in the present condition of the statutes on immunity a witness before a congressional committee is in a difficult position, and the risk he assumes is considerable. In court our established procedure provides a prompt, authoritative ruling and an opportunity for the witness to recanvass his position in the light of the ruling. The same thing was to a less extent true in the days when Congress itself conducted proceedings for contempt against it. But Congress adopted the practice of referring charges of contempt to the courts; and so now an authoritative ruling upon the validity of a witness's position comes at a time when, and in a forum where, the witness cannot reexamine his position in the light of the ruling. He is no longer before his inquirer (the congressional committee), and so he has no opportunity to reconsider his refusal and to answer the question. But the cure for that ill is for the Congress, not for the courts.

█ The present controversy as posed to us by counsel involves a naked refusal to answer. But, as we have pointed out, the record shows that Bart interposed an objection to these questions on the ground of pertinency. We refer to that situation

for a moment. It clearly appears from the record that Bart was made fully aware both of the position of the subcommittee and of the possible consequences of his refusal to answer. After he had refused to answer the four questions involved in these counts, the Chairman of the Subcommittee said: "And then I suppose you know that under the law a question innocent on its face can't be arbitrarily ignored. You can't refuse to answer such a question without running the risk of the consequences." And in that connection the Chairman also remarked that Bart's counsel knew what the law was. Those statements of the Chairman fully met the requirements of the law as we have stated them above. They constitute sufficient evidence to justify a finding that the refusal to answer was deliberate and intentional, and thus they support the general verdict of guilty.

We hold, as we held in the Emspak case, supra, that a specific direction to answer is not a prerequisite to conviction for contempt.

█ Count Seven of the indictment was for refusal to answer "Whether the defendant would briefly summarize for the sub-committee the positions held by him from which he had received a salary or gratuity, prior to the position which the defendant held at the time the question was asked." The record shows that Bart replied that it was evident from the question that a newspaper was involved, and he refused to answer because the question infringed upon the freedom of the press and was in violation of the First Amendment to the Constitution. Counsel for the Subcommittee then inquired, "That is the ground upon which you refuse to answer the question as to what positions you have

15. 1951, 340 U.S. 367, 374, 71 S.Ct. 438, 95 L.Ed. 344.

16. See also Heike v. United States, 1913, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450; Mason v. United States, 1917, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198; Townsend v. United States, supra; Morford v. United States, 1949, 85 U.S.App.D.C. 172, 176 F.2d 54, reversed on other grounds, 1950, 339 U.S. 258, 70 S.Ct. 586,

94 L.Ed. 815; Id., 1950, 87 U.S.App.D.C. 256, 184 F.2d 864, certiorari denied, 1950, 340 U.S. 878, 71 S.Ct. 120, 95 L. Ed. 638; Barsky v. United States, 1948, 83 U.S.App.D.C. 127, 134, 167 F.2d 241, 248, certiorari denied, 1948, 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767; Loew's, Inc. v. Cole, 9 Cir. 1950, 185 F.2d 641, 659, certiorari denied, 1951, 340 U.S. 954, 71 S.Ct. 570, 95 L.Ed. 688.

held prior to your present position?". Thereupon, without any intervening word, the Chairman of the Subcommittee said, "Did you ever hold any positions other than positions with newspapers?". Bart replied, "I did," and then proceeded to state in some detail these other positions which he had held. The original question, involving the newspaper, was not repeated. Thus it appears that, when the question upon which this count of the indictment was based was asked, the witness asserted that it infringed a constitutional guaranty, and thereupon the question was reframed to eliminate that objection. In short, when the constitutional infirmity of the question was raised, the Committee abandoned the question as asked and asked another question. Under these circumstances the witness was not in contempt of the Committee in declining to answer the question as originally asked. The Committee indicated clearly that it agreed with his view of the initial question. Abandonment of a question is in no sense unusual, and the Committee's intent to abandon in this instance is clear. No contrary evidence appears.

■ Count Eight of the indictment was for the refusal of Bart to answer a question described thus: "Who were the other officials of the Ohio section of the Communist Party during the period when the defendant was organizer there." It is agreed, and clearly appears from the record, that in response to this question Bart asserted the constitutional privilege against self-incrimination guaranteed by the Fifth Amendment. The Government says that this privilege was not available to Bart at the time he asserted it, because this question was related merely to the details of an answer already given and a reply to this question would not enlarge the incrimination, if any, already implicit in the prior answer given without objection. The Government relies upon Rogers v. United States.[17]

In the Rogers case the accused testified without objection that she had been Treasurer of the Communist Party of Denver but that she had given up possession of the records and had turned them over to another person. The Supreme Court held to the rule, to which it said federal courts have universally held, that "where criminating facts have been voluntarily revealed, the privilege cannot be invoked to avoid disclosure of the details."[18] The Court further said (as we have already pointed out) that, when the witness was asked to furnish the name of the other person, "the court was required to determine, as it must whenever the privilege is claimed, whether the question presented a reasonable danger of further crimination in the light of all the circumstances, including any previous disclosures."[19] The Court held that after the witness's admission that she had held the office of Treasurer disclosure of the name of her successor presented no more than a "mere imaginary possibility" of increasing the danger of crimination.

The petitioner in the Rogers case made the further contention that, even if the testimony that the witness had been Treasurer of the Party had subjected her to possibility of prosecution for violation of the Smith Act, 18 U.S.C.A. § 2385, further testimony indicating that she knew the name of her successor in office would subject her to possible prosecution for conspiracy to violate that Act. The Court referred to Blau v. United States[20] as explicitly rejecting that contention. The Court held that questions relating to activities in the Communist Party are criminating both as to violation of the Smith Act and as to conspiracy to violate that Act. It held that, although a conspiracy must necessarily involve at least two persons, one person can be convicted of conspiring with persons unknown, and that therefore the identity of other members of a conspiracy is not essential to the conviction of one conspirator.

In the case before us Bart testified: "I was organizer and head of the Communist

---

17. Supra, 340 U.S. 367, 71 S.Ct. 438.

18. Id., 340 U.S. at page 373, 71 S.Ct. at page 442.

19. Id., 340 U.S. at page 374, 71 S.Ct. at page 442.

20. 1950, 340 U.S. 159, 71 S.Ct. 223, 95 L. Ed. 170.

Party at different times, in different years. * * * In Illinois and Pennsylvania, among many." He was then asked whether he had been a section organizer for the Communist Party in Ohio. He replied, "Most likely." The question was repeated, and he said that he did not know the exact period of time—"It is 14 years ago." He was then asked the question quoted in Count Eight and to that question asserted the privilege against self-incrimination.

We think the opinion and decision in the Rogers case, supra, supports the Government's position in respect to Count Eight. If appellant's equivocal answer, "Most likely", to the question directly mentioning Ohio be deemed an affirmative, clearly the identity of other persons in the Ohio section of the Party would not, under the doctrine of the Rogers case, increase the danger already incurred by the admission. If the "Most likely" be treated as no answer at all, nevertheless the incrimination effected by the admission of Party membership and activity in Illinois and Pennsylvania was not increased by acquaintance with members in Ohio. Violation of the Smith Act[21] was the potential crime, and it consisted of advocacy of the overthrow of the Government by force and violence, conspiracy to do so, or membership in or organization of a society or group having that objective. Membership in the Communist Party was not the crime but was one link in proof of the crime. So, if Bart admittedly was active in the Party in Illinois and Pennsylvania, the fact that he knew Party officers in Ohio would not increase the possibility of incrimination for violation of the statute. The advocacy which, by the admission, might be deemed to have occurred in Illinois and Pennsylvania, was not increased as a potential incrimination because it began or continued in Ohio. At most, the information as to Ohio could only add a third possible venue to the two already established for the prosecution of the offense by the admission as to Illinois and Pennsylvania.[22] We think that under the Rogers case the identity of the other officials of the Ohio section of the Communist Party when Bart was admittedly the organizer in Illinois and Pennsylvania could not increase the danger of incrimination already incurred by him in his prior testimony.

█ Appellant also asserts as error the refusal of the trial court to dismiss the indictment. The motion to dismiss was upon the ground that of the twenty members of the indicting grand jury ten were Government employees and two more were wives of Government employees. This is the same point, indeed the same grand jury, involved in Emspak v. United States. The point was there decided against the contentions of the appellant.

█ Whether, in view of the foregoing, we should affirm in respect of Counts Three to Six, inclusive, or should remand for a new trial on those counts is a problem different from that presented in Quinn v. United States, 91 U.S.App.D.C. ——, 203 F.2d 20, also decided today. There the trial court ruled explicitly that as a matter of law the sole defense offered was not available. Thus the resulting judgment of conviction was not based upon the evidence offered pro and con; it was based upon the evidence offered by the prosecutor alone. So, when we reversed upon the legal question, a claimed factual defense was made available to the accused, and it was necessary that a new trial, in which that defense would be considered, be had. In the present case, as to Counts Three through Six there was a general judgment of guilty. Had there been a jury, there would have been instructions embodying statements of the law to be applied. But there was no jury and no instructions and no statement of the law applied. In such a case the only question for us is whether there was sufficient evidence to support the judgment. We find that there was. That ends our consideration. It is suggested, in effect, that we make three assumptions, (1) that the trial court erred upon a legal point in respect to Count Seven, (2) that therefore it made the same error in respect of Counts Three to Six, inclusive, and (3) that it did not resolve any conflicts in evidence in reaching its finding on those counts. It is

21. 62 Stat. 808 (1948), 18 U.S.C. § 2385.

22. 62 Stat. 826 (1948), 18 U.S.C. § 3237.

our view that we cannot make any of those assumptions. In viewing the conviction under Count Seven we find, as we have indicated, the evidence conclusive upon the face of the record; there was no contradictory evidence to support the finding of guilt on that count; hence we reverse. In respect to Counts Three through Six we find substantial evidence to support the judgment. We cannot speculate that the trial court in its own mind made an error of law not stated or shown on the record.

▉ The judgment of conviction on Counts One, Two and Seven is reversed and on Counts Three, Four, Five, Six and Eight is affirmed. Since the sentence (three months' imprisonment and a fine of $500) is supported by the conviction on any of the counts, that judgment **is**

Affirmed.

BAZELON, Circuit Judge (dissenting).

All of the circumstances and pleadings relating to the issue of the qualifications of Government employees to serve as grand jurors in this case are identical with those in Quinn v. United States.[1] For the reasons set forth in my opinion in that case, I would reverse and remand for a new trial here.

I think there is another ground for ordering a new trial, based upon my view in Quinn of the words "refuses to answer" in § 192.[2] I shall discuss only the impact of this view upon the instant record.

Here the court relies upon certain statements in a colloquy between appellant and his counsel, on the one hand, and Committee members and their counsel, on the other, as showing that appellant was made aware that his grounds for objecting to answer were overruled by the Committee.[3] Con-

cededly, those statements are pertinent. But so is the statement of the Committee chairman that " * * * we don't rule on objections."[4] And in response to a Committee member's suggestion that the witness "be advised of the possibilities of contempt," the Committee chairman said: "No, he has counsel. Counsel knows that is the law."[5] In my view the record presents seriously conflicting statements which raise a question of fact for the trial court. An examination of the record demonstrates that the court, sitting without a jury, did not so understand the matter. For while it found that appellant "comprehended that he was refusing to answer those questions,"[6] this conclusion was not based upon findings, express or implied, (1) that appellant was clearly apprised that his grounds for not answering were rejected by the Committee and (2) that he was afforded another opportunity to answer. This, I think, is manifest from appellant's conviction on Count 7. There he was charged with refusing to answer a question after Committee counsel merely repeated the grounds for appellant's objection, and then proceeded immediately to propound another question. This court reverses that conviction because "the Committee abandoned the question as asked and asked another question. * * * The Committee indicated clearly that it agreed with [appellant's] view of the initial question."[7] Thus, the only thing that suggests that the Committee meant to have an answer to the question in Count 7 was its subsequent certification for contempt, initiating the indictment here. If the trial court applied the same view in considering all of the other counts, and there is no contrary indication, then clearly it committed similar error as to those counts.

Appellant asserted lack of pertinency as the ground for not answering the questions

1. 91 U.S.App.D.C. 344, 203 F.2d 20.

2. 11 Stat. 155 (1857), as amended, 52 Stat. 942 (1938), 2 U.S.C.A. § 192.

3. Majority opinion, 91 U.S.App.D.C. 370, 203 F.2d 50, 51.

4. J.A., p. 14.

5. Id. at 12.

6. J.A., p. 105.

7. Majority opinion, 91 U.S.App.D.C. 370, 203 F.2d 51.

involved in Counts 3, 4, 5 and 6. At the oral argument here, appellant's counsel conceded that those questions were pertinent. "So," says the court, "the controversy now posed concerns naked refusals to answer." [8] As I made clear in Quinn, a naked refusal, *i. e.,* "a refusal without a statement, at the time, of the reason therefor" does not require affirmative action by the inquiring authority.[9] Thus the court, in effect, treats counsel's concession as a retroactive waiver of appellant's right to "be made aware," as stated in the court's present opinion, "by some method at some time, that despite his position the inquirer means that he shall answer the question."[10] I cannot reconcile this result with the decision in Quinn today where the court said, "It must appear that [a witness] was aware of the intention of his inquirer that answers were required despite his objections."[11]

This court affirms the conviction on Count 8 on the ground that under the Rogers[12] doctrine appellant's claim of the privilege against self-incrimination was unavailing.[13] ) I do not reach a consideration of that issue because, as this court agrees, there is no basis for treating a claim of the privilege against self-incrimination differently from any other objection to answer.[14] It therefore follows that even under Count 8, the fact finder must still weigh, on the one hand, the Committee's statement advising that the claim of the privilege was not available, and, on the other hand, the Committee's statements that it would not rule on objections. Thus, before this court can consider the validity of appellant's claim of the privilege, it must first determine that the court below found that the witness had been clearly apprised of the Committee's adverse ruling and afforded another opportunity to answer.[15]

8. Id., 91 U.S.App.D.C. 370, 203 F.2d 47.

9. 91 U.S.App.D.C. 344, 203 F.2d 33.

10. Majority opinion, 91 U.S.App.D.C. 370, 203 F.2d 49.

11. 91 U.S.App.D.C. 344, 203 F.2d 25.

12. Rogers v. United States, 1951, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344.

13. See majority opinion, 91 U.S.App.D.C. 370, 203 F.2d 51, 52.

14. Id., 91 U.S.App.D.C. 370, 203 F.2d 48, et seq.

15. See Quinn v. United States, supra, 91 U.S.App.D.C. 344, 203 F.2d 38.