## BART v. UNITED STATES.

No. 117.   Argued April 5, 1955.—Decided May 23, 1955.

*James T. Wright* and *A. L. Wirin* argued the cause for petitioner. With them on the brief was *Frank J. Donner.*

*Robert W. Ginnane* argued the cause for the United States. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Olney, Beatrice Rosenberg* and *John R. Wilkins.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

On November 20, 1950, the petitioner was indicted under 2 U. S. C. § 192 for refusing to answer thirty-two questions put to him by a subcommittee of the Committee on Un-American Activities of the House of Repre-

sentatives. During the trial in the District Court for the District of Columbia, the Government abandoned twenty-four of these counts. The District Judge, sitting without a jury, found Bart guilty of the remaining eight charges.[1] On appeal, the Court of Appeals for the District of Columbia Circuit reversed the judgment upon three of the counts and, one judge dissenting, affirmed as to the others.[2] From that decision, we granted certiorari[3] and set the case down for argument along with the two companion cases. *Quinn* v. *United States, ante,* p. 155, and *Emspak* v. *United States, ante,* p. 190.

In response to a subpoena, petitioner appeared before the subcommittee on June 21, 1950. He was then general manager both of Freedom of the Press Co., Inc., which publishes the *Daily Worker,* and of the *Daily Worker* itself. During the course of the interrogation, members of the committee and the committee counsel posed various questions dealing with Bart's background, his activities, and alleged associates. Among these were the five questions which, because of petitioner's refusal to answer, led to the convictions now under scrutiny. The particular inquiries involve petitioner's name when he came to this country as a child, his name before it was changed years ago to Philip Bart pursuant to a New York court order,[4] his father's name, and the identity of officials of the Ohio section of the Communist Party in

---

[1] *United States* v. *Bart,* unreported, Criminal No. 1746-50 (D. D. C.). The opinions of the District Court, denying petitioner's motions to dismiss the indictment, appear *sub nom. United States* v. *Emspak,* 95 F. Supp. 1010, 1012.

[2] 91 U. S. App. D. C. 370, 203 F. 2d 45.

[3] 347 U. S. 1011.

[4] Hearings before House Committee on Un-American Activities Regarding Communist Infiltration in Labor Unions, 81st Cong., 2d Sess., Part III, 2636.

1936.[5]  To the questions concerning name or family background, he raised objections of pertinency; to the other, he unequivocally pleaded the privilege against self-incrimination.

In finding petitioner guilty, the trial court rejected these defenses as without merit.  Before the Court of Appeals, petitioner abandoned his defense as to lack of pertinency.  The majority thought that this abandonment in effect erased petitioner's objections from the committee record and that they were thus faced with "naked refusals to answer"[6] which did not require affirmative rulings from the committee. We cannot agree. The objections were in fact made before the committee and the witness was entitled to a clear-cut ruling at that time, even though the claims were later abandoned or found to be invalid.  *Quinn* v. *United States, supra.*  Without such a ruling, evidence of the requisite criminal intent to

---

[5] As phrased in the indictment, these questions were as follows:

"COUNT THREE

"What was the name of the defendant when he came to the United States.

"COUNT FOUR

"What was the defendant's father's name.

"COUNT FIVE

"Under what name did the defendant's father become a citizen of the United States.

"COUNT SIX

"What name did the defendant change his name from.

.          .          .          .          .

"COUNT EIGHT

"Who were the other officials of the Ohio section of the Communist Party during the period when the defendant was organizer there [sometime in 1936]."  Transcript of Record, p. 109, *Bart* v. *United States,* 91 U. S. App. D. C. 370, 203 F. 2d 45.

[6] 91 U. S. App. D. C., at 372, 203 F. 2d, at 47.

violate § 192 is lacking. An abandonment made two and one-half years after the objections were raised cannot serve retroactively to eliminate the need for a ruling. If the requirement of criminal intent is not satisfied at the time of the hearing, it cannot be satisfied *nunc pro tunc* by a later abandonment of petitioner's objection.[7] Therefore, the issue before us is, upon the record as it stood at the completion of the hearing, whether petitioner was apprised of the committee's disposition of his objections.

At no time did the committee directly overrule petitioner's claims of self-incrimination or lack of pertinency. Nor was petitioner indirectly informed of the committee's position through a specific direction to answer. At one juncture, Congressman Case made the suggestion to the chairman that the witness "be advised of the possibilities of contempt"[8] for failure to respond, but the suggestion was rejected. The chairman stated:

> "No. He has counsel. Counsel knows that is the law. Proceed, Mr. Tavenner."[9]

A few moments later, when committee counsel inquired as to certain details of petitioner's marriage, the following colloquy took place:

> "Mr. UNGER [Counsel for petitioner]. Mr. Chairman, what concern is it of anybody here——
>
> "Mr. WALTER. We permit you to appear with your client for the purpose of advising your client. You apparently are old enough to have had some experience in court.
>
> "Mr. UNGER. Yes, indeed.
>
> "Mr. WALTER. Of course, you know there are many preliminary questions asked witnesses, leading up to

---

[7] Cf. *United States* v. *Rumely,* 345 U. S. 41, 48: "In any event, Rumely's duty to answer must be judged as of the time of his refusal."

[8] Hearings, *supra,* note 4, at p. 2636.

[9] *Ibid.*

some point. As they are propounded you will readily learn what the purpose is. Just advise your client and don't argue with the committee, *because we don't rule on objections."* [10]

The questioning proceeded on this basis.

Because of the consistent failure to advise the witness of the committee's position as to his objections, petitioner was left to speculate about the risk of possible prosecution for contempt; he was not given a clear choice between standing on his objection and compliance with a committee ruling.[11] Because of this defect in laying the necessary foundation for a prosecution under § 192, petitioner's conviction cannot stand under the criteria set forth more fully in *Quinn* v. *United States, supra.*

Our disposition of the case makes it unnecessary to consider petitioner's other contentions. The judgment below is reversed and the case remanded to the District Court with directions to enter a judgment of acquittal.

*Reversed.*

MR. JUSTICE REED, with whom MR. JUSTICE MINTON joins, dissenting.

This case is controlled entirely by the rule enunciated by the majority in the second ground for the decision in *Quinn* v. *United States, ante,* p. 155. We shall not here repeat our comments made regarding that rule and its application which are set out in our dissent in the *Quinn* and *Emspak* cases. But we cannot agree that under the

---

[10] *Id.,* at 2637 (italics added).

[11] In one instance, committee counsel observed that in his opinion the question asked was not incriminating, but this was disputed by counsel for petitioner and not ruled upon by the chair. When petitioner repeated the objection, stating that he felt the question to be of an incriminating nature and that he therefore refused to answer, the question was immediately abandoned. See *id.,* at 2638–2639.

*Quinn* rule the petitioner here was not sufficiently apprised of the disposition of his Fifth Amendment and pertinency objections for him to be held guilty of violating § 192. For us the record establishes, as it did for the two courts below, that the petitioner knew that the grounds for his objections were not accepted by the committee; that the committee required him to answer; that he willfully refused to answer. As the majority stated the rule in *Quinn*, p. 170, "the committee is not required to resort to any fixed verbal formula to indicate its disposition of the objection. So long as the witness is not forced to guess the committee's ruling, he has no cause to complain." Under this rule we think that the extract from the record set out below places this petitioner in the status of one who "has no cause to complain."

"Mr. Walter: Did you ever hold any positions other than positions with newspapers?

"Mr. Bart: I did.

"Mr. Walter: What were they?

"Mr. Bart: I was organizer and head of the Communist Party at different times, in different years.

"Mr. Walter: Where?

"Mr. Bart: In Illinois and Pennsylvania, among many.

"Mr. Tavenner: The Daily Worker of March 28, 1936, shows you to have been a section organizer for the Communist Party in Ohio. That is correct, is it not?

"Mr. Bart: Most likely.

"Mr. Tavenner: Well, you know whether you were a section organizer for the Communist Party in Ohio, do you not?

"Mr. Bart: I do not know the exact period of time you mentioned. It is 14 years ago.

"Mr. Tavenner: *Who were the other officials of the Ohio section of the Communist Party during the*

*period of time you were organizer there?*   [Count 8, emphasis supplied.]

"Mr. Bart: I object to this question. I will not answer it, standing on my rights in accordance with Article V of the Constitution, and furthermore I protest because this committee has asked this question of numerous people and has infringed upon their rights as American citizens.

"Mr. Tavenner: I think, Mr. Bart, I should point out that your testimony relating to other people who were associated with you at that time could not in any way incriminate you under the Fifth Amendment.

"Mr. Unger: I should like to correct you, Mr. Tavenner.

"Mr. Walter: You advise your client.

"Mr. Tavenner: You have told us you were a section organizer for the Communist Party in Ohio, and my question now is, who were the officials who worked with you in that work, that is, officials of the Ohio section of the Communist Party?

"Mr. Unger: Permit me to advise my client that Mr. Tavenner, counsel, is in error in his interpretation of the Constitution so far as the Fifth Amendment is concerned, and that Mr. Bart, the witness, is entirely correct in his interpretation of the Constitution, and has a right to assert that this committee has no right—no right, let me make it plain—

"Mr. Walter: Under our procedure the attorney is permitted to advise his client and then the client, the witness, answers the question. You may advise your client.

.       .       .       .       .

"Mr. Unger: As he has stated in his previous answer, he is not required to testify against himself.

"Mr. Bart: I stand on the advice of my counsel. I am not required to testify against myself, and in accordance with Article V of the Constitution I will not answer the question.

"Mr. Tavenner: I was not asking you to testify against yourself. I was asking you to state the names of other persons associated with you.

"Mr. Bart: I consider this an attempt on the part of the committee to use this against myself as well as against others, as it has on many previous occasions.

"Mr. Walter: And therefore you refuse to answer?

"Mr. Bart: I refuse to answer."

The colloquy set out above pertains only to count 8.* We think the record also shows that the committee rejected the pertinency objections on the other four questions which constitute the other four counts and therefore petitioner willfully refused to answer these as well. However, since conviction on any one count is sufficient to sustain the judgment, enough of the record is set out above to show what we consider to be the error of the majority. Since in our view the committee apprised the petitioner that his Fifth Amendment objection was rejected, it is necessary to state our agreement with the courts below that, as the record shows, petitioner had waived the privilege by his answers to prior questions concerning his Communist Party affiliation and activities. We agree with the Court of Appeals that this is controlled by *Rogers* v. *United States,* 340 U. S. 367. *Bart* v. *United States,* 91 U. S. App. D. C. 370, 376, 203 F. 2d 45, 51.

It might be better practice for congressional committees to follow a procedure of specifically overruling

---

* "Count Eight—Who were the other officials of the Ohio section of the Communist Party during the period when the defendant was organizer there [sometime in 1936]." R. 109, *Bart* v. *United States,* 91 U. S. App. D. C. 370, 203 F. 2d 45.

objections of witnesses and directing the witnesses to answer in the manner commonly followed in the courts. We feel, however, that in this case, where the petitioner was apprised that his objection was rejected and he still refused to answer, it should be held that he is guilty of a violation of § 192. We would affirm the judgment below.

MR. JUSTICE HARLAN, dissenting.

I would affirm the judgment of conviction in this case, on the reasoning stated in part II of my dissenting opinion in the *Emspak* case, *ante*, p. 203, at p. 213, decided this day. To what is said there I should add what follows.

Even under the Court's standard of "apprisal," the record in this case is convincing that Bart must have understood that the Subcommittee was insisting on his answers to the questions involved in the indictment. I need only refer to the fact that four of the counts of the indictment charge Bart with refusing to answer what was in substance the same question, namely, what Bart's name had been before he changed it. As to these questions the record shows the following:

"Mr. Case [Committee Member]. What was your name at the time you came to the United States?

"Mr. Bart. I have already answered this question.

"Mr. Walter [Committee Chairman]. What was it?

"Mr. Unger [Bart's Counsel]. Mr. Chairman, I think we are spending a good deal of time, with all due respect to the Chair, on a point that has absolutely no bearing on any issue here.

"Mr. Walter. That is only your opinion.

"Mr. Unger. I said that was my opinion.

"Mr. Case. Mr. Chairman, I don't know what the question will lead up to, but it certainly has been customary, when we have been interrogating wit-

nesses who have come to the United States from other countries, to know when they came to the United States, and to know under what name they came, and to know the name shown on the passport. There is nothing improper or out of the way in asking such a question. I think we should have an answer to the question of the name he had when he came to the United States.

"Mr. Unger. Are you suggesting the inquiry has to do with what this man did when he was 10 years old? You are talking about a 10-year-old boy.

"Mr. Walter. Just a moment. I think Mr. Tavenner should be able to proceed, and after his questions, Mr. Case, you may ask such questions as you may desire. May I suggest, Mr. Tavenner, that you refresh the witness' recollection by telling him what his name was before he assumed his present name? Proceed.

"Mr. Tavenner [Committee Counsel]. You are a naturalized American citizen?

"Mr. Bart. Yes.

"Mr. Tavenner. How did you become naturalized?

"Mr. Bart. Through process of my father.

"Mr. Tavenner. What was your father's name?

"Mr. Bart. I have already dealt with this question.

"Mr. Tavenner. When was your father naturalized?

"Mr. Bart. I do not remember.

"Mr. Unger. Just a minute.

"(Witness confers with his counsel.)

"Mr. Bart. About 30 years ago.

"Mr. Tavenner. Do you refuse to tell the committee your father's name?

"Mr. Unger. Mr. Tavenner, he doesn't refuse to tell the committee. He is trying to tell the com-

mittee that this line of inquiry is a highly improper one.

"Mr. Walter. That is not within his province. The committee determines what is proper and what is not proper, and it is not up to you to determine that.

"Mr. Unger. That is true.

"Mr. Case. Mr. Chairman, it seems to me the counsel should advise his client and not the committee.

"Mr. Unger. I am not trying to advise the committee. I tried to respectfully point out why it is an improper question. He is not ashamed of his father's name or his mother's name. What difference can it possibly make what his name was when he came here?

"Mr. Walter. We are not going to have you arguing with the committee or giving us your legal opinion, which may or may not be worth anything.

"Mr. Unger. I have no further comment on the question.

"Mr. Walter. All right.

"Mr. Bart, you claim citizenship by virtue of your father's citizenship; is that right?

"Mr. Bart. That is right.

"Mr. Walter. Under what name did your father become a citizen of the United States?

"Mr. Bart. Under his own name.

"Mr. Walter. What was that name?

"Mr. Bart. I have already stated my reply to this question as far as I am concerned.

"Mr. Walter. How can you claim citizenship by virtue of your father's citizenship if you don't know what name your father used when he became a citizen?

"Mr. Unger. Mr. Chairman—

"Mr. Walter. Let the witness answer the question. You may advise your client.

"Mr. Bart. I have answered I am a citizen by virtue of that fact, and that this is my legal name by which I vote and am registered and am known.

"Mr. Walter. When did you legally change your name?

"Mr. Bart. Many years ago.

"Mr. Walter. Where?

"Mr. Bart. In the city of New York.

"Mr. Walter. Did you have your name changed in court?

"Mr. Bart. Yes; about 15 years ago.

"Mr. Unger. His answer is about 15 years ago.

"Mr. Walter. I understand. What name did you change your name from?

"Mr. Bart. I have already stated my reply to this question.

"Mr. Harrison [Committee Member]. I understand you refuse to answer the chairman's question?

"Mr. Bart. My answer is that I have answered what my name is here, which is the only question pertaining to the inquiry, it seems to me.

"Mr. Walter. Of course all of this is a matter of public record?

"Mr. Bart. Correct.

"Mr. Walter. And then I suppose you know that under the law a question innocent on its face can't be arbitrarily ignored. You can't refuse to answer such a question without running the risk of the consequences.

"Mr. Unger. I think, again, Mr. Chairman, Mr. Bart has indicated very plainly he has not been contumacious in any regard. He states his name has been Philip Bart for a large number of years.

"Mr. Walter. Don't argue with the committee. You advise your client as you see fit.

"Mr. Case. Mr. Chairman, it seems to me the witness should be advised of the possibilities of contempt when he fails to answer a question as simple and as proper as your question as to what his name was before it was changed.

"Mr. Walter. No. He has counsel. Counsel knows that is the law. Proceed, Mr. Tavenner." *

The very fact that the same answer was sought in four different ways must have impressed upon a man of Bart's intelligence that the Committee considered his objections unfounded, and wished him to answer.

For the reasons stated in my *Emspak* dissent, I do not deal with any of the petitioner's other contentions, save to say that on this record I consider them all untenable.

I would affirm the judgment of conviction.

---

*The Court attaches importance to the colloquy between Mr. Case and Mr. Walter shown in the last two paragraphs quoted above, and to Mr. Walter's later rejoinder to Mr. Unger: "Of course, you know there are many preliminary questions asked witnesses, leading up to some point. As they are propounded you will readily learn what the purpose is. Just advise your client and don't argue with the committee, *because we don't rule on objections.*" (Italics supplied by the Court.) Read in context, these excerpts indicate to me nothing more than that the committee was expressing its impatience with interruptions by counsel. I am unable to read the record, as the Court seems to have done, as indicating that the Subcommittee was avoiding taking a position on Bart's objections.