### ZINKHAN v. DISTRICT OF COLUMBIA, Use of LANGELLOTTI et al.

(Court of Appeals of District of Columbia. Submitted February 11, 1921. Decided March 7, 1921.)

#### No. 3451.

1. **Trial** ⬅️60(1)—**Evidence as to events before incarceration of plaintiff held incompetent before justification of imprisonment.**

    In an action against the superintendent of an asylum and jail for false imprisonment, evidence offered by plaintiff as to the circumstances surrounding his arrest and detention by the officers before he was taken to the asylum and jail was incompetent, before the defendant had made any attempt to justify the imprisonment on such proceedings.

2. **Appeal and error** ⬅️1053(3)—**Instructions held not to cure admission of incompetent evidence.**

    In action for false imprisonment, admission of incompetent evidence as to the arrest and detention of plaintiff before he was taken to the asylum and jail of which defendant was superintendent, which was of a nature calculated to inflame the jury, was not cured by an instruction that plaintiff could recover only the actual damages he suffered because of his confinement in the asylum and jail during the time his detention therein by defendant was unlawful, even if a pointed and vigorous instruction could have removed the effect of such evidence.

3. **Asylums** ⬅️7—**Superintendent of asylum and jail held not liable for acts of subordinates.**

    The superintendent of the Washington Asylum is not liable for damages for the acts of his subordinates, who are appointed by the commissioners, and not subject to discharge by the superintendent, under Act March 3, 1911, and many of whom possess special skill as alienists, which the superintendent does not possess.

4. **Asylums** ⬅️7—**False imprisonment** ⬅️8—**Superintendent liable for detention before receiving commitment.**

    The superintendent of the Washington Asylum and Jail is liable for the detention therein of a man brought to the asylum by officers for observation as to his sanity, between the time the superintendent personally learned of such detention and the time he received a proper commitment authorizing the detention.

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Asylums ⬅➡7—False imprisonment ⬅➡13—Superintendent held not liable for confinement in asylum instead of jail.**

Where a man brought to the Washington Asylum and Jail for mental observation was, by order of the physicians and nurses, confined in the asylum rather than in the jail, the superintendent was not liable for the damages suffered by reason of the place of confinement, since, not being an alienist himself, he was justified in relying on the opinion of the physicians.

**6. False imprisonment ⬅➡34—Expenses of securing discharge from lawful confinement not recoverable.**

In an action for false imprisonment, plaintiff cannot recover the expenses of securing his release and discharge, which were incurred after the imprisonment had become legal by the issuance of a proper commitment.

Appeal from the Supreme Court of the District of Columbia.

Action by the District of Columbia, to the use of Frank Langellotti, and by Frank Langellotti in his own right, against Lous F. Zinkhan. Judgment for plaintiff. and defendant appeals. Reversed, with directions to grant a new trial.

F. H. Stephens and Robert L. Williams, both of Washington, D. C., for appellant.

G. W. Offutt, Jr., and C. V. Imlay, both of Washington, D. C., for appellee.

STAFFORD, Acting Associate Justice. Langellotti sued the defendant, Zinkhan, for unlawfully imprisoning him in the Washington Asylum and Jail, to his humiliation, vexation, and disgrace, as well as to his financial loss and damage. The defendant pleaded that in all he did he was acting as superintendent of said institution, pursuant to his legal duty, and in obedience to an order of commitment signed by a proper officer and regular on its face. The case was tried to a jury; a verdict was returned for the plaintiff, and judgment thereon rendered. The case is here for a review of the court's action in admitting evidence and in granting and refusing instructions.

It appears that the plaintiff was arrested in the night, and brought to the institution at about 1 o'clock in the morning, and was then received by the official in charge, and that the defendant knew nothing about the matter until about 9 o'clock of the same morning. The first six assignments of error relate to the admission in evidence of the circumstances attending the arrest, detention, and conveyance of the plaintiff, prior to his reception at the Asylum and Jail.

[1] Instead of contenting himself with putting in his own case, by showing his imprisonment and forcible detention by the defendant, and leaving the defendant to justify his action, if and as he could, the plaintiff chose to anticipate all possible defenses by going back and showing all that led up to his being taken to the place of imprisonment. This course was objected to step by step by the defendant, and exceptions were taken. The result is that the record shows a good deal of highly prejudicial matter, introduced on the plea that it was preliminary and introductory to what followed; whereas, it was mat-

ter not necessary in that behalf, and for which the defendant was in no way responsible. For example, the plaintiff was allowed to show that one police officer had a warrant for plaintiff's arrest, and went to the place where the plaintiff worked to serve it, but did not find him, and then went to the plaintiff's home, and, still being unsuccessful, turned the warrant over to another police officer; that this officer succeeded, taking the plaintiff into custody at his home in the middle of the night, conveying him to the police station, and there delivering him to the officer in charge of the station; that there the plaintiff's name was taken and placed on the book, his person searched, and he himself conveyed in a patrol wagon to the Asylum Hospital, upon instructions given by the officer who had made the arrest; that a certain pencil memorandum, showing that the plaintiff was to be held for mental observation, was prepared by the officer in charge at the station, and handed to another officer, to be by him copied on a certain blank form when he should arrive at the hospital; and that among the records of the officer having charge of the cases of mental disorder there was an absence of certain necessary papers.

[2] As before stated, there was nothing in all this which the plaintiff needed to show in order to make out his case. If the defendant had chosen to go into these matters, and had shown the court that they were admissible in his defense, another question would have been presented; but the defendant chose to begin his defense with the time when he became responsible in some measure for what was done to the plaintiff, and he had a right to protest against the admission of these circumstances. They were of a character to inflame the minds of the jury against the defendant, as well as against those who were the immediate actors, and it would be a matter of grave doubt whether, by the most pointed and vigorous language, the court would have been able to lead the jury to cast it out of their minds on the question of damages. But although the court did grant and read an instruction that the plaintiff could recover only such actual damages as he suffered because he was confined in the Washington Asylum and Jail during the time his detention therein by the defendant was unlawful, the matter was not otherwise called to the attention of the jury by the court, and we cannot but feel that the poison inherent in such evidence must have done its work.

[3] It appears that when the plaintiff was brought to the hospital of the Washington Asylum and Jail at about 1 o'clock in the morning the defendant was not personally on duty, but was abed and asleep, and knew nothing of what happened in matters concerning this case until about 9 o'clock. The plaintiff was turned over to the doctor and nurse in charge, and was received and treated like other patients who are sent there for observation touching their mental condition. The defendant is superintendent by virtue of an appointment from the commissioners of the District, and under his direction and control are the jail building itself and all the other buildings used in connection with it, including the hospital building, where the plaintiff was received. All the subordinates of the superintendent receive their appointments from the commissioners themselves, and are not subject to discharge

by the superintendent. 36 Stat. 1003. It appears that the number of such subordinates is large, including physicians, nurses, and orderlies; that the superintendent is not a physician nor an alienist.

The declaration and the plaintiff's view of the law treat the superintendent as responsible for the acts and omissions of all his subordinates in the line of their duty, and therefore treat the defendant as responsible for the reception and detention of the plaintiff, as much before the time when the facts came to his notice as afterwards; for the declaration does not allege that there was any failure on the part of the defendant to make proper rules or to give suitable directions to his subordinates. The defendant's view, on the other hand, is that he is not liable for the acts of his subordinates as such, since he is not made liable by any statutory provision, nor has any power to appoint or remove them, and since they as well as he are acting in the performance of public duties.

We are referred by plaintiff's counsel to an elaborate and learned note to State v. Kolb, 1 A. L. R. 222, for a review of the authorities upon the question, from which it appears that the general rule (see Robertson v. Sichel, 127 U. S 507, 8 Sup. Ct. 1286, 32 L. Ed. 203) is against the liability of public officers for the acts of their subordinates; but he contends that the defendant is to be considered like a sheriff, and sheriffs, the author of the note says, are usually held liable for the acts of their deputies, generally upon an obligation, declared by statute, but also, he thinks, upon a common-law principle of which the statute is only declaratory. It would be impossible to decide how much weight should be given to this statement of the result of the cases without a careful examination of each and a knowledge of the statute under which the case arose. Flanagan v. Hoyt, 36 Vt. 565, for instance, was based upon statutory liability.

But we need not go into the matter at such length, because, even if a sheriff, who appoints his own deputies, and is generally made liable for their official acts by statute, is also liable upon common-law principles, it does not follow that the defendant is also liable; for the defendant is not a sheriff. He is a superintendent of a great institution, with very many subordinates, exercising care in matters touching which he has no knowledge or skill, and in whose appointment and retention he has no voice, and he was acting, at the most, only as a warden or keeper of a jail. A jailer and a sheriff are not the same, although the same person may hold both offices. It seems to us it would be unjust to hold a defendant liable, in a case like the present, for the acts of his subordinates merely as such, and when there was no other ground upon which to hold him. For the time, therefore, after the reception of the plaintiff at the hospital until the defendant became cognizant of his presence, we hold as a matter of law that upon the facts presented the defendant was not liable.

[4] Beginning, then, with the time at which the defendant did learn of the plaintiff's presence, and going on to the time at which he received the warrant of commitment, he was holding the plaintiff, as the court below rightly ruled, without authority of law. Just when the defendant received the commitment was a fact for him to show as a part of his justification, and it may have been as late as 4 o'clock in

the afternoon. He admits having received notice of the plaintiff's imprisonment as nearly as 9 or 9:30 in the morning. For these seven or eight hours the imprisonment was unlawful upon any view of the case that we are able to take, and for it the defendant was legally responsible. But we agree with the court below that the commitment was a sufficient justification to the defendant as jailer to receive and hold the plaintiff from that time on.

[5] At this point, however, another question arises: Was the defendant justified in keeping the plaintiff in the hospital, where he did, or was he bound to have kept him in the jail proper? This was treated as a question of fact by the court below, and as dependent upon the question "whether the plaintiff showed indications of being of unsound mind," or whether "there were other circumstances upon the basis of which defendant Zinkhan might reasonably believe that said plaintiff should be placed in said psychopathic ward." This would seem to be a fair way to submit the question, if there was really any question to submit. But to our minds the case shows beyond any question that in keeping the plaintiff where he did the defendant could not be justly charged with acting negligently or unreasonably. It is not suggested that he had the slightest ill will toward the plaintiff. Before the plaintiff came to his attention as a prisoner, he had never even heard of him. Personally it is not claimed that he treated him in any way that would indicate animus of any sort. On the other hand, the plaintiff was observed by the physicians and nurses in charge, and was retained in the psycopathic ward in accordance with their judgment. How can it fairly be said that he was not justified as a reasonable man in acting upon their judgment? Was he to set up his own opinion upon a question touching which he had no special knowledge? If it had been a case of supposed physical illness, instead of supposed mental illness, would he not have been justified in relying and acting upon the advice of the physicians and nurses, unless there were something to indicate that they were grossly mistaken or unfair? It really seems to us too plain for doubt that he did in this respect what he was in duty bound to do in the circumstances with which he had to deal.

[6] If we are right in this, then there was no ground for recovery after the commitment paper was received, and of course it follows that there was no ground for assessing against the defendant as damages the amount it may have cost the plaintiff to secure his release and discharge from an imprisonment which was at that time legal.

The judgment must be reversed, with costs, and with directions to grant a new trial.

Reversed.

Mr. Justice STAFFORD, of the Supreme Court of the District of Columbia, sat in the place of Mr. Justice ROBB in the hearing and determination of this appeal.