Mary Jane KEENEY, Appellant,

v.

UNITED STATES of America, Appellee.

No. 11752.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 26, 1954.

Decided Aug. 26, 1954.

Petition for Rehearing In Banc Denied
Oct. 22, 1954.

Mr. Frank J. Donner, New York City, of the bar of The Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. Joseph Forer, Washington, D. C., was on the brief, for appellant.

Mr. John D. Lane, Asst. U. S. Atty., Washington, D. C., with whom Messrs. Leo A. Rover, U. S. Atty., William Hitz and Lewis A. Carroll, Asst. U. S. Attys., Washington, D. C., were on the brief, for

appellee. Mr. William R. Glendon, Asst. U. S. Atty., Washington, D. C., at time record was filed, entered an appearance for appellee.

Before EDGERTON, PRETTYMAN, and DANAHER, Circuit Judges.

EDGERTON, Circuit Judge.

Appellant, a former employee of the United Nations, was a witness before a Subcommittee of the Committee on the Judiciary of the United States Senate. She was asked whether anyone in the State Department had aided her in obtaining employment with the United Nations. She did not answer, and asserted a privilege not to answer by reason of the Charter and the Staff Rules of the United Nations. On the theory that she had "refused" to answer, she was prosecuted for contempt of Congress. Rev. Stat. § 102, as amended, 52 Stat. 942, 2 U.S.C.A. § 192. The District Court overruled her claim of privilege and she was convicted. United States v. Keeney, D.C., 111 F.Supp. 233.

Appellant was not asked whether anyone in the State Department *told her he would try* to aid her. Perhaps it was a mistake not to ask her that question, but if so, the mistake was not hers. We need not speculate whether she would have answered that question if it had been asked, or whether she would have been punishable if she had not answered it. She was asked whether anyone in the State Department *did* aid her: "Did anyone in the State Department aid you in obtaining employment with the United Nations?" Whether she realized it or not, this was equivalent to asking her whether the United Nations officials who decided to appoint her had received and been influenced by communications from anyone in the State Department recommending that she be appointed.

Staff Rule 7 of the United Nations provides that "Staff members shall exercise the utmost discretion in regard to all matters of official business. They shall not communicate to any other person any unpublished information known to them by reason of their official position except in the course of their duties or by authorization of the Secretary-General." In my opinion both the first sentence and the second sentence of this Rule support appellant's failure to answer. (1) Since the appointment of official personnel is official business, appellant could not answer without violating her obligation to "exercise the utmost discretion in regard to all matters of official business." She could not, consistently with "the utmost discretion", even answer that she did not know, for that would have meant that her superiors had not told her. Whether officials do or do not tell an employee who aided her in obtaining employment is a matter of official policy and official business. (2) The question related to "unpublished information". The United Nations does not tell the world what recommendations underlie appointments of staff members. The United Nations Administrative Manual even defines "unpublished information" to include "the appointment * * * [of] or any other confidential information concerning" a staff member. I think it plain that staff members would not have such unpublished and confidential information unless it had been made "known to them by reason of their official position".

The Charter of the United Nations supports Staff Rule 7. The Charter provides:

"Article 100

"1. In the performance of their duties the Secretary-General and the staff shall not seek or receive instructions from any government or from any other authority external to the Organization. They shall refrain from any action which might reflect on their position as international officials responsible only to the Organization.

"2. Each Member of the United Nations undertakes to respect the exclusively international character of the responsibilities of the Secretary-General and the staff and not to seek to influence them in the discharge of their responsibilities. * * *

"Article 105

"1. The Organization shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfillment of its purposes.

"2. Representatives of the Members of the United Nations and officials of the Organization shall similarly enjoy such privileges and immunities as are necessary for the independent exercise of their functions in connection with the Organization." 59 Stat. 1052, 1053.

Compulsory disclosure of the persons who influence appointments to the staff of the United Nations would not be consistent with the independence of the Organization or "the exclusively international character of the responsibilities of the Secretary-General and the staff * * *." (Art. 100, Par. 2.) And the prospect of such disclosure might influence staff members, in one degree or another, to regulate their official conduct with a view to avoiding embarrassment of sponsors. The privilege of nondisclosure is therefore "necessary for the independent exercise of their functions in connection with the Organization." (Art. 105, Par. 2.)

Thus the Charter and the Staff Rules of the United Nations establish, in my opinion, the privilege on which appellant relied. And her failure to answer is within the spirit if not the letter of the International Organizations Immunities Act, which provides in § 7(b), 59 Stat. 672, 22 U.S.C.A. § 288d(b): "Representatives of foreign governments in or to international organizations and officers and employees of such organizations shall be immune from suit and legal process relating to acts performed by them in their official capacity and falling within their functions as such representatives, officers, or employees except insofar as such immunity may be waived by the foreign government or international organization concerned."

 So far in this opinion I speak only for myself. But we all agree that

appellant's conviction must be reversed because of errors in the admission of evidence. The government had to prove that the question the Subcommittee asked was "pertinent to the question under inquiry" before the Subcommittee, *i. e.* to the subject of "subversive activities". If the Supreme Court had not ruled otherwise, we should have thought this a matter for the jury to decide, like any other element of the crime with which the appellant was charged. But the Supreme Court has squarely held that the "question of pertinency under § 102" is a question for the court. Sinclair v. United States, 279 U.S. 263, 298, 49 S.Ct. 268, 73 L.Ed. 692. Cf. Bowers v. United States, 92 U.S.App.D.C. 79, 81, 202 F.2d 447, 449. Since pertinency did not concern the jury, the court erred in permitting the jury to hear testimony about the appellant's activities which bore only on pertinency and tended strongly to prejudice the jury. Appellant's counsel repeatedly objected to the taking of such testimony in the jury's presence. We disagree with the government's contention that counsel "invited" the error and that, for this reason, it does not require reversal.

I agree with Judge Prettyman that there was no obvious *refusal* to answer. In my own opinion there was clearly no deliberate and intentional refusal.

The result of our several opinions is this. The conviction is reversed with instructions to grant a new trial. In so far as the answer depends upon data in the files of the United Nations or upon information derived from those files, it was privileged by the Charter and the Staff Rules and could not legally be revealed. Evidence as to pertinency will be taken in the absence of the jury. The question whether the appellant's action was under all the circumstances a deliberate and intentional refusal to answer will be put to the jury with the other jury issues.

Reversed.

DANAHER, Circuit Judge (concurring).

I agree that the conviction should be reversed and a new trial be ordered. The error requiring this result stems from the failure to exclude the jury while highly prejudicial evidence was received to establish the element of pertinency.

From the very outset the jury heard the appellant linked to a nefarious, world-wide Communist movement, with her associates numbered among those performing acts of espionage and sabotage even as they purloined secrets of the United States in favor of the Russian government. "[These matters] were of a character to inflame the minds of the jury against the defendant . . . and it would be a matter of grave doubt whether, by the most pointed and vigorous language, the court would have been able to lead the jury to cast it out of their minds . . .. [We] cannot but feel that the poison inherent in such evidence must have done its work." Zinkhan v. District of Columbia, 1921, 50 App.D.C. 312, 314, 271 F. 542, 544.

That pertinency must be shown by the Government is clear, Bowers v. United States, 1953, 92 U.S.App.D.C. 79, 81, 202 F.2d 447, but the question as to the sufficiency of the evidence to establish pertinency is for the court, not the jury. Sinclair v. United States, 1929, 279 U.S. 263, 298, 299, 49 S.Ct. 268, 273, 73 L.Ed. 692. There the Supreme Court said:

"The question of pertinency under section 102 was rightly decided by the court as one of law. It did not depend upon the probative value of evidence. That question may be likened to those concerning relevancy at the trial of issues in court, and it is not essentially different from the question as to materiality of false testimony charged as perjury in prosecutions for that crime.

Upon reasons so well known that their repetition is unnecessary it is uniformly held that relevancy is a question of law. . . . And the materiality of what is falsely sworn, when an element in the crime of perjury, is one for the court.

". . . The matter for determination in this case was whether the facts called for by the question were so related to the subjects covered by the Senate's resolutions that such facts reasonably could be said to be 'pertinent to the question under inquiry.' *It would be incongruous and contrary to well-established principles to leave the determination of such a matter to a jury.* [Citing cases.]" [1] (Emphasis supplied.)

Government counsel correctly recognized that pertinency is a matter for decision by the court, and before making his opening statement asked, at the bench, "if it is the Court's plan to hear our pertinency testimony out of the hearing of the jury." The trial judge replied: "I think I will hear all the testimony in the presence of the jury, but then I shall decide the pertinency question. I don't think there is any necessity for excluding the jury unless counsel has any other views, in which event I shall be very glad to hear counsel's views."

\* \* \* \* \* \*

Defense Counsel: "We will make that request, Your Honor, that it be heard out of the presence of the jury," and in further colloquy added "We have no objection, of course, to his making a statement in respect to facts which are ultimately for your decision . . .." Whether counsel thus invited the opening statement which followed or not, the outline of the Government's case was inevitably highly prejudicial to the defendant. At its conclusion, the defense

---

1. Cf. Interstate Commerce Commission v. Brimson, 1894, 154 U.S. 447, 488, 14 S. Ct. 1125, 1137, 38 L.Ed. 1047, where the Court said: "If, as we have endeavored to show, this proceeding makes a case or controversy within the judicial power of the United States, the issue whether the defendants are under a duty to answer the questions propounded to them, and to produce the books, papers, documents, etc., called for, is manifestly not one for the determination of a jury. The issue presented is not one of fact, but of law exclusively."

moved for a mistrial because "the underground and overground Communist activities, and the acts of espionage, sabotage and subversive activities, and of Silvermaster and Ullman, are all intentionally prejudicial to the defendant and far outside the scope of the issues in this case." The motion was denied. When the trial judge ruled during the bench conference that testimony as to pertinency would be received in the presence of the jury, it is probable that he had no foreknowledge as to the nature of the evidence which the Government intended to offer. The opening statement, however, was permitted to be received by the jury without admonition or explanation of the purpose for which the appellant's purported personal history and background were to be put in evidence. It must have had a disastrous effect so far as the defendant was concerned. The jury had been told that appellant had been very closely associated with Communist activities, that she had associated with important members of the Communist underground and overground, that she and her husband became close acquaintances and fraternized with one Silvermaster and one Ullman who were well known "as alleged espionage agents working for the Russian government in obtaining secrets from our Government," that she had been active in the Institute of Pacific Relations whose ramifications were to undermine the security of the United States and to accomplish certain activities of the Institute in foreign affairs that would "line us and them up with the Soviet Union." It seems scarcely possible that defense counsel who had requested that such proposed testimony be heard out of the presence of the jury could have expected any such opening statement as has been summarized. At its conclusion prompt objection was voiced which was renewed as various aspects of the case unfolded.

The Government called as its first witness a lawyer employed as a member of the professional staff of the Senate Committee on the Judiciary and after certain preliminary questions the following occurred:

"Q. Would you be good enough, before we go into her testimony, to explain the pertinency of her testimony to the purposes of the Internal Security Subcommittee, as contained in the resolution that authorized the creation of that subcommittee?

"In other words, what did the committee have in mind in seeking her testimony pursuant to the resolution?

"Mr. Donner. If Your Honor please, may I ask that this testimony be given out of the presence of the jury?

"The Court. No. I don't see the necessity for that.

"Mr. Donner. Then I object."

The witness testified that the Committee was attempting to learn a number of facts about the Institute of Pacific Relations, how it operated, what it sought to accomplish, and the degree to which it had accomplished it. "The Institute of Pacific Relations was an institution which had been taken over by Communists and was being operated for their purposes." The Institute had sought to place and had in fact placed "its persons" in high places in government and elsewhere in positions of influence. The Committee came across the name of Mary Jane Keeney in a document which had been seized from the files of the Institute; the document indicated that appellant was active in the Washington Advisory Committee of the Institute; and "the Committee found that Mrs. Keeney had a long record of what appeared to be Communist affiliation—"

"Mr. Donner. I object to this, Your Honor.

"The Court. Objection overruled. This testimony is not given as proof of any fact, but merely as proof of the pertinency of the inquiry . . .."

Defense counsel again insisted that the question of pertinency was a matter of

law for the court, and upon a ruling that the trial judge saw no reason for excluding the jury, defense counsel moved for a mistrial.

The witness continued that appellant in San Francisco prior to 1940 had attended a number of Communist meetings and after coming to Washington had entered a circle of acquaintanceship which included Communists and suspected Communists, numbering among her friends Nathan Gregory Silvermaster and Leonard Ullman. The Committee had "unevaluated" information that Mrs. Keeney had been placed in the United Nations with the help of persons in the IPR and the assistance of persons in the State Department.

Defense counsel renewed his motion for a mistrial and moved to strike the testimony and both motions were denied. That the admission of such evidence over appellant's objections was highly prejudicial can not be doubted, and the rulings with reference thereto and denial of appellant's motion for mistrial constitute reversible error. A new trial must be granted.

On the record presented we do not, in my view, reach the question of privilege. Appellant in her brief and in oral argument has urged us to adopt the sophistry which both before the Senate committee and the District Court she applied to the question: "Did anyone in the State Department aid you in obtaining employment with the United Nations?"

Cited to us are the United Nations charter, its rules and interpretations, and section 7(b) of the International Organizations Immunities Act, 59 Stat. 669, 22 U.S.C.A. § 288 et seq. The question asked does not lead us within the fold of privilege so predicated. There is not the slightest suggestion at any stage that by virtue of her official position the appellant gleaned knowledge from the official files as to how her employment came about. On the contrary, after her conviction, the appellant took the witness stand and was sworn and testified ". . . I do not know to whom the United Nations wrote for references, *because that information is never disclosed to the applicant,* to the Secretariat . . .." (Emphasis supplied.)[2]

When a witness before the Senate committee, if appellant did not know the answer to the question, all she had to say was "I don't know"—if she did not know. If, either before obtaining employment with the United Nations or after such employment had been terminated, she learned—other than from official sources —that someone in the State Department had aided her in obtaining employment she was bound to answer "Yes." If she had personal knowledge—other than from official sources—that no one in the State Department had been of "aid" in

2. In the course of questioning by the trial judge the following occurred:

By the Court:

"Q. Did anyone connected with the State Department aid you in securing your job or your position with the United Nations? A. Your Honor, I don't know, for this reason, and I am not quite sure what you mean by the word 'aid.'

To me, when the question was put to me by the subcommittee, I interpreted the word 'aid' to mean recommend.

I do not know who did recommend me for the position in the United Nations. Since I filed a written application listing thereon the supervisors under whom I had worked for many years, I do not know to whom the United Nations wrote for references, because that information is never disclosed to the applicant, to the Secretariat.

If 'aid' means influence, intercession, or undue pressure of any kind, the answer is no, for so far as I know, at the time I applied for employment in the United Nations in 1948 I did not know anyone in the State Department. I made no effort to find out if I knew anyone. I did not write to anyone. I did not seek in any way to exercise any influence.

"Q. Well, specifically, did anyone in the State Department intercede for you or urge that you be appointed? A. I cannot answer that question, Your Honor.

"Q. I am not now referring to inquiries written to persons whom you gave as reference. What I mean is this, or what the committee no doubt meant was this: Did anyone intercede for you? A. Not to my knowledge."

her procuring employment, she was bound to answer "No."

In short, even if we were to reach the question of the claimed privilege, unless she acquired information by virtue of her official position during the period of her employment by the United Nations that someone in the State Department did aid her in obtaining such employment, she was bound to answer according to the fact. Whatever privilege may be said to stem from the charter and the staff rules and regulations of the United Nations would apply only with respect to information known to the witness by reason of official position, past or present.

The International Organizations Immunities Act, § 7(b), 59 Stat. 671, 22 U.S.C.A. § 288d(b), provides: "Representatives of foreign governments in or to international organizations and officers and employees of such organizations shall be immune from suit and legal process *relating to acts performed by them in their official capacity and falling within their functions as such representatives, officers, or employees . . .."* (Emphasis supplied.) This witness was not subjected to suit or legal process relating to acts performed by her in her official capacity. There is no need to give strained and extended interpretation to the very useful Immunities Act which by its terms has no application here.

After trial when the very question was put to her, with her own particular qualification she answered "I don't know." She specified "that information is never disclosed to the applicant . . .." When she applied for employment in the United Nations she "did not know anyone in the State Department." "Q. Did anyone intercede for you? A. Not to my knowledge."

The answer to the question was clearly within the power of the witness to provide, and a reading of her testimony in the Joint Appendix discloses that the jury might properly be asked to pass upon the issue as to her contumacy as alleged.

Although we are agreed that a new trial must be had, it is not to be understood that a trial judge must always exclude the jury when evidence is being presented with reference to an issue of law. A ruling as to exclusion of the jury would be a matter for the trial judge to determine in the exercise of his broad discretionary powers. Holt v. United States, 1910, 218 U.S. 245, 248, 31 S.Ct. 2, 54 L.Ed. 1021. Cf. Model Code of Evidence, Rule 11 (1942), 9 Wigmore, Evidence § 2550 (3d ed. 1940). Where the issue as to pertinency, solely for the court, may be readily separable from other questions in the case, the judge might properly exclude the jury. Otherwise, the situation would call for careful instruction, and where evidence as to pertinency must be heard in connection with other issues to be resolved by the jury, proper admonition can be afforded together with an explanation of the limited purpose for which evidence as to pertinency must be so received. Here, however, in the absence of admonition and adequate explanation, we cannot doubt that the evidence previously outlined was highly prejudicial.

PRETTYMAN, Circuit Judge (concurring).

I concur in the result, and I agree with both of my brethren in the parts of their opinions dealing with the reception before the jury of the evidence relating to pertinency. Were it not for the unequivocal holding of the Supreme Court in the Sinclair case, I would think that, since pertinency is an element of this offense, it, like all other such elements, would be for the jury. Since the Supreme Court holds the issue is not for the jury, I agree that evidence which is not relevant to the issues before the jury and which is highly prejudicial to the accused on those issues, ought not be heard by the jury.

On the other point, concerning the accused's privilege not to answer the question put to her, I find myself midway between my two brethren. I think that, in

so far as the answer to the question, "Did anyone in the State Department aid you in obtaining employment with the United Nations?", depended upon data in the files of the United Nations or upon information derived from those files, it was privileged by the Charter and the Staff Rules and could not legally be revealed. To that extent the witness could and should have refused to answer. But it is conceivable that wholly apart from any files or information gleaned from them the witness had knowledge that someone at the State Department did aid her in getting employment. Some such matters are frequently known personally and altogether outside official channels. Information thus obtained was not privileged, and if this witness knew of any of that sort in her case she should have said so. If she did not know of any, she should have answered to that effect. As the event turned out, that was the view of the United Nations Secretariat and also the view later adopted by the witness. It seems to me that her initial position in response to the question was not fully protected.

At the same time it seems to me that this witness's course might not be deemed by a jury to be a *refusal* to answer. She said in reply to the question that she could not answer under the Staff Rules, etc. She applied to the Secretariat for a ruling, and when the ruling was received she answered the Subcommittee as far at it permitted her to do so. Her answer then was, in effect, that she did not know of any aid from State Department personnel, and she explained why. We discussed this question in a different context in Bart v. United States[1] and there pointed out, citing cases, that the offense of contempt for refusal to answer is a deliberate and intentional refusal. We remarked: "If a witness interposes an objection or query to the propriety of a question, e. g., its pertinency, he may not be refusing to answer."[2] And again we remarked:

"Whether a witness means to refuse to answer is a question to be determined from all the circumstances. Like the element of intent in every criminal case it is a question of fact, determinable by the jury, if there be a jury, under appropriate instruction and definition by the court."[3] It seems to me that the same reasoning applies to the case at bar. The question whether Mrs. Keeney deliberately and intentionally refused to answer, or merely raised a question as to her ability to answer under binding legal compulsions, was a question to be determined by the jury from all the circumstances.

1. 1952, D.C.Cir., 91 U.S.App.D.C. 370, 203 F.2d 45, certiorari granted, 1954, 347 U.S. 1011, 74 S.Ct. 872.

2. 91 U.S.App.D.C. at page 373, 203 F.2d at page 48.

