**UNITED STATES of America,**
**Appellee,**

v.

**Sidney TUROFF, Appellant.**

**No. 183, Docket 26243.**

United States Court of Appeals
Second Circuit.

Argued Jan. 6, 1961.

Decided June 26, 1961.

Lipsitz, Green, Fahringer & Fleming, Buffalo, N. Y. (Herald P. Fahringer, Jr., Buffalo, N. Y., of counsel), for appellant.

J. Walter Yeagley, Asst. Atty. Gen., Neil R. Farmelo, U. S. Atty., W. D. N. Y., Buffalo, N. Y., George B. Searls, Robert L. Keuch, Attys., Department of Justice, Washington, D. C., for appellee.

Before WATERMAN, MAGRUDER and FRIENDLY, Circuit Judges.

WATERMAN, Circuit Judge.

This is an appeal from a conviction after a jury trial in the United States District Court for the Western District of New York in which appellant was charged with having violated 2 U.S.C.A. § 192.[1] On October 1, 1957 Sidney Turoff, an honorably discharged combat air force veteran of World War II, was a witness before a Subcommittee of the Committee on Un-American Activities of the House of Representatives which was conducting hearings in Buffalo, New York, for the purpose of inquiring into:

"the entry and dissemination in the Buffalo area of foreign Communist Party propaganda; execution by administrative agencies concerned of laws requiring the listing of printing presses and machines capable of being used to produce or publish printed matter, in the possession, custody, ownership, or control of the Communist Party or Communist fronts; the extent, character, and objects of Communist infiltration into industrial, civic, and political organizations of the Buffalo area;

and misuse of passports by subversives and concealment of material facts in applications for passports."

After Turoff had identified himself, had stated his place of residence, and had given his occupation as that of a general factory worker, he was identified by one Alan Dietch as the person to whom Dietch had previously sold certain printing equipment which Dietch stated he understood was to be used in the Communist Party underground. Turoff then testified that the equipment, though not sold to him, was indeed purchased at his request, and that he was a member of the American Communist Party when it was purchased.

He went on to detail his experience with the Communist Party until the time he voluntarily left it early in April 1957. He freely described the organization within the Party of the units to which he belonged and he fully testified to particulars of Party operations with which he was familiar.

At this point in his interrogation Turoff was asked the following question:

"Mr. Arens: Now, kindly tell us sir, who were the members of the Steel Section of the Communist Party to which you were attached as of the time you disassociated yourself from the Communist Party in April of 1957?"

After having the purpose of the question explained to him [2] Turoff refused to

1. § 192 reads as follows:
"§ 192. Refusal of witness to testify or produce papers
"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

2. "Mr. Arens: Now, kindly tell us sir, who were the members of the Steel Section of the Communist Party to which you were attached as of the time you disassociated yourself from the Communist Party in April of 1957?
"Mr. Turoff: May I ask, sir, what is the purpose of that question?
"Mr. Arens: Yes, sir. The purpose of that question is this, that if you tell us the names of the people who were members of the Steel Section of the Communist Party in April of 1957 this committee will, if we have not already done so, forthwith cause to be issued for their

answer, declaring that his constitutional rights of association were violated by the question and that he believed the committee was without power to ask questions of that nature. After being directed to answer Turoff persisted in his refusal.

Committee counsel then proceeded to question him for the purpose of obtaining the names of persons he may have entertained in his home and those whom he had known were members of the Party when he had been a member. Turoff refused to divulge any names. Finally, Turoff was asked to name the person to whom he had delivered the printing equipment admittedly delivered to him by Dietch. He refused to answer that question, and, even after counsel for the Committee sought to explain the pertinency of the question to him,[3] and after he was specifically directed to answer it, persisted in the refusal.

The refusal to divulge the names of the members of the Steel Section of the Communist Party in April of 1957, and the name of the person to whom the printing equipment was delivered, were, respectively, Counts I and III of the indictment before us in which the grand jury charged that Turoff had violated 2 U.S.C.A. § 192. It is from his conviction on both of these counts that he appeals.

During the course of the trial the prosecution, without defense objection, introduced as an exhibit the transcript of the subcommittee hearing which, of course, included the detailed testimony of his Party activities that Turoff had freely given in answer to the other questions the committee had asked him. However, thereafter, when the prosecuting attorney began to read this entire transcript to the jury, appellant's counsel vehemently objected, contending that only the questions Turoff refused to answer, and his refusals, were relevant to the proof of the alleged crime. The objection was overruled as not having been taken early enough. Thereupon government counsel read into the record all of Turoff's answers wherein he had freely disclosed his personal knowledge of the Communist Party; and, as well, the questions, explanations, and directions of the subcommittee members and its counsel during Turoff's interrogation. This exhibit, which, when read, comprised 39

---

appearance before this committee subpoenas, so that we can undertake to elicit from them, as we have from you today, such information as we are able to procure from them respecting the operation of the Communist Party in this industrial area for the purpose of enabling the Congress of the United States to better enact legislation or amendments to existing legislation undertaking to cope with this existing situation. The Internal Security Act of 1950, as amended by the Communist Control Act of 1954, undertakes in many particulars to deal right with this problem of Communist penetration of heavy industry. This committee is under a mandate to maintain a surveillance over the operation and administration of that legislation. I now repeat: Would you kindly tell this committee the names of the persons who, in April of 1957, just some few months ago, were known to a certainty by you to be members of the Steel Section of the Communist Party in this heavy industrial area of Buffalo?"

**3.** "Mr. Turoff: I still answer with the same explanation. I don't understand the

purpose for it. I do think it is a violation of the constitutional right under the first, and I do feel it is beyond the scope of this committee's jurisdiction.

"Mr. Arens: So there can be no possible question on this record, I want to again invite your attention to the law presently under scrutiny by this committee relating to printing equipment. If you can tell us the name of the person to whom you delivered this printing equipment, which was used by you as a Communist, we understand, we will then, by our investigative sources, try to find that individual, try to find that printing equipment, try to find information about its use and operation so that this committee and the Congress might, with those facts, better appraise the existing law, better appraise and devise legislation to cope with the very situation which we are presently confronted with, the use of printing equipment by the Communist Party. With that explanation, Mr. Chairman, I again respectfully suggest that the witness be directed and ordered to answer the question as to whom he delivered the printing equipment."

pages of the trial record, was taken by the jury at the conclusion of the case into the jury room.

As one of several grounds upon which he relies, appellant assigns as error the failure of the trial judge to exclude this material from the jury's consideration. We are of the opinion that appellant's contention is a sound one and that it was error to admit into evidence for jury consideration this entire colloquy. Pages and pages of what transpired at the committee investigation were entirely irrelevant to any of the issues the jury had to deal with, and much of it was highly prejudicial to the defendant. We, therefore, reverse the judgment of conviction and remand the case back to the district court for a new trial.

In Deutch v. United States, 81 S.Ct. 1587, 1593–1594, the Supreme Court set out the dual issues of pertinency that are involved in a prosecution under 2 U.S.C.A. § 192 for a Contempt of Congress, as follows:

"As our cases make clear, two quite different issues regarding pertinency may be involved in a prosetion under 2 U.S.C. § 192, 2 U.S.C.A. § 192. One issue reflects the requirement of the Due Process Clause of the Fifth Amendment that the pertinency of the interrogation to the topic under the congressional committee's inquiry must be brought home to the witness at the time the questions are put to him. 'Unless the subject matter has been made to appear with undisputable clarity, it is the duty of the investigative body, upon objection of the witness on grounds of pertinency, to state for the record the subject under inquiry at that time and the manner in which the propounded questions are pertinent thereto.' Watkins v. United States, 354 U.S. [178], at pages 214–215 [77 S.Ct. 1173, at page 1193, 1 L.Ed.2d 1273]. See Barenblatt v. United States, 360 U.S. [109], at 123–124, 79 S.Ct. 1081, 3 L.Ed.2d 115]. The other and different per-

tinency issue stems from the prosecution's duty at the trial to prove that the questions propounded by the congressional committee were in fact 'pertinent to the question under inquiry' by the committee. 'Undeniably a conviction for contempt under 2 U.S.C. § 192, 2 U.S.C.A. § 192 cannot stand unless the questions asked are pertinent to the subject matter of the investigation.' Barenblatt, supra, [360 U.S.] at [page] 123 [79 S.Ct. at page 1091] '[T]he statute defines the crime as refusal to answer "any question pertinent to the question under inquiry." Part of the standard of criminality, therefore, is the pertinency of the questions propounded to the witness.' Watkins, supra, [345 U.S.], at [page] 208, [77 S.Ct. at page 1190]. See Wilkinson v. United States, 365 U.S. [399], at [page] 407–409, 413 [81 S.Ct. 567, 5 L.Ed.2d 633]; Braden v. United States, 365 U.S. [431], at [page] 433, 435–436 [81 S.Ct. 584, 5 L.Ed. 2d 653]; Sacher v. United States, 356 U.S. 576, 577 [78 S.Ct. 842, 2 L.Ed.2d 987]; Sinclair v. United States, 279 U.S. 263, 296–297 [49 S. Ct. 268, 73 L.Ed. 692]. These two basically different issues must not be blurred by treating them as a single question of 'pertinency.'"

Whether the witness has been made aware of the pertinency of the particular interrogatory at the time it is asked bears upon the issue of whether he has knowingly refused to answer that interrogatory, and whether he has so knowingly refused to answer is the ultimate question for jury decision. Therefore, all that is admissible into evidence at the trial in order to assist the jury in the resolution of this essential issue is the committee's explanations to the witness of the pertinency of the interrogatory after the witness has had his initial difficulty with the question asked him. In this case the material appearing at footnotes 2 and 3, supra, was the only portion

of the transcript that was relevant to a resolution of whether the respondent was guilty or innocent of the charges set forth in the counts of the indictment.

██ The broader issue of whether the questions "were in fact pertinent to the question under inquiry" was one of law for the court to decide and was not one of fact for the jury. Sinclair v. United States, 1929, 279 U.S. 263, 298, 49 S.Ct. 268, 73 L.Ed. 692; Braden v. United States, 1961, 365 U.S. 431, 81 S. Ct. 584, 587–588, 5 L.Ed.2d 653; Liveright v. United States, 1961, 108 U.S. App.D.C. 160, 280 F.2d 708, 714, certiorari granted, 81 S.Ct. 1914; Russell v. United States, 1960, 108 U.S.App.D.C. 140, 280 F.2d 688, 689, certiorari granted, 81 S.Ct. 1913. See United States v. Siegel, 2 Cir., 263 F.2d 530, 533, certiorari denied, 1959, 359 U.S. 1012, 79 S.Ct. 1147, 3 L.Ed.2d 1035; United States v. Alu, 2 Cir., 1957, 246 F.2d 29, 32. Material relevant solely to this pertinency issue should have been presented only to the judge for his sole perusal. In truth the admission into evidence of such material when it is highly prejudicial to the accused is ground for the reversal of a jury conviction. Keeney v. United States, 94 U.S. App.D.C. 366, 218 F.2d 843. There is no doubt that the introduction of the extraneous testimony given by appellant to the subcommittee was highly prejudicial to him upon this trial. In his subcommittee testimony he had admitted his active participation in the communist conspiracy, had detailed his own activities, and had freely stated that for a period of years he had used a name other than his own. It is obvious that one who is or who was a communist conspirator is disadvantaged in a jury trial; and

even though the trial judge charged that it was no concern of the jury "whether these defendants were or were not communists" the damage done by the admission of pages of irrelevant prejudicial evidence could not be thereby undone.[4]

██ Our next consideration is whether appellant's objection to the admission of this inadmissible exhibit was seasonably made, that is, whether once having allowed the transcript to be marked and admitted as evidence appellant's counsel could object to having it read to the jury.

Wigmore has declared with respect to the "Time of the Objection" that:

> "The general principle governing the time of the objection is that *it must be made as soon as the applicability of it is known* (or could reasonably have been known) *to the opponent,* unless some special reason makes a postponement desirable for him and not unfair to the proponent of the evidence." 1 Wigmore on Evidence, § 18(A) (3rd ed. 1940).

When the exhibit was first offered and admission was not objected to counsel could properly have assumed that the transcript was being admitted for the court's use on the broader issue of pertinency. His objection was made at the time the prosecution sought to use the evidence in violation of the dictates of Keeney v. United States, supra. The objection was not unreasonably delayed, or unfair to the prosecution at the time it was made inasmuch as it was made at the first moment the improper use became apparent.

Reversed and remanded.

**4.** See, e. g., the oft-quoted concurring *opinion of* Mr. Justice Jackson in Krulewitch v. United States, 1949, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790: "The naive assumption that prejudicial effects can be overcome by instructions to the jury * * * all practicing lawyers know to be unmitigated fiction. See Skidmore v. Baltimore & Ohio R. Co., 2 Cir., 167 F.2d 54."

See also the remarks of the late Chief Judge Lehman of the New York Court of Appeals in People v. Robinson, 1937, 273 N.Y. 438, 445–446, 8 N.E.2d 25.