**Abram FLAXER, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 12027.**

United States Court of Appeals
District of Columbia Circuit.

Argued March 6, 1956.

Decided June 21, 1956.

Petition for Rehearing Denied
July 30, 1956.

822

Mr. David Rein, Washington, D. C., with whom Mr. Joseph Forer, Washing-

ton, D. C., was on the brief, for appellant.

Mr. John D. Lane, Asst. U. S. Atty., with whom Messrs. Leo A. Rover, U. S. Atty., at time of argument, and Lewis Carroll and William Hitz, Asst. U. S. Attys., were on the brief, for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON and DANAHER, Circuit Judges, sitting en banc. (Circuit Judges BASTIAN and BURGER took no part in the consideration or decision of this case.)

WILBUR K. MILLER, Circuit Judge.

Indicted under 2 U.S.C.A. § 192[1] for willfully failing and refusing to produce at a Senatorial subcommittee hearing on October 5, 1951, certain records required of him by a subpoena *duces tecum* and found guilty by a jury, Abram Flaxer appeals.

The appellant was president of the United Public Workers, a union made up of employees of Federal, state and local governments. In 1951 the Subcommittee on Internal Security of the Senate Committee on the Judiciary received information indicating that he and the other national officer of the union and certain of its directors were members of the Communist Party. Since the organization was therefore apparently dominated at the top by communists, the subcommittee decided to conduct an investigation as to whether its membership was infiltrated by them. To that end, a subpoena *duces tecum* was directed to Flaxer, commanding him to appear before the subcommittee on October 5, 1951, and to bring with him, *inter alia*, a list of the union's members showing which were employed by the Federal Government and which by other governmental units.

1. The statute is as follows:

"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

The subpoena was served on Flaxer September 19, some two weeks before the date of the hearing. He appeared before the subcommittee on October 5 but did not bring with him the classified membership list, which he said he could have compiled in a week's time. Instead, he read to the subcommittee a previously prepared written statement setting forth his reasons for not obeying the subpoena in that respect, after which Senator Watkins (who constituted the subcommittee) directed him nevertheless immediately to produce the required records. He did not do so, and obviously he could not then have produced the list, even had he been disposed to obey after his objections had been overruled, because he had disabled himself by not preparing it in advance. Then, since it was physically impossible for Flaxer to file on that day the list he had not assembled and which it would take him a week to prepare, the Senator ordered him to submit it within ten days. Flaxer responded that he would "have to take that under consideration." He did not submit the membership list to the subcommittee within ten days thereafter, and has never submitted it.

Following the hearing on October 5, the subcommittee filed Report No. 1336 as to Flaxer's contempt in refusing to answer certain questions and in failing and refusing to obey the subpoena *duces tecum*. The Senate adopted a resolution that the Report be certified "under the seal of the United States Senate, to the United States Attorney for the District of Columbia to the end that said Abram Flaxer may be proceeded against in the manner and form provided by law." Senate Resolution 295, 82d Cong., 2d Sess., adopted March 19, 1952.

Thereafter Flaxer was indicted for violating the Code provision to which we have referred by willfully failing and refusing to produce on October 5, 1951, the membership list called for by the subpoena. At his trial, the counsel who had interrogated him on this subject at the hearing was the only witness. Testifying for the Government, he read into the record the portion of the transcript of the appellant's testimony before the subcommittee which had to do with Flaxer's non-compliance with the subpoena *duces tecum*. The appellant did not testify in his own behalf. In charging the jury the trial judge submitted the question whether, *on October 5, 1951*, Flaxer willfully failed and refused to produce the records required by the subpoena. The verdict was that he committed the offense on that day as charged in the indictment.

As a reason for reversal the appellant says he was not *ordered* on October 5 to produce the records at the hearing then being conducted and that therefore under the Quinn and Bart cases [2] he could not be found guilty of a willful disregard of the subpoena, and was entitled to a judgment of acquittal. With respect to this the appellant says in his brief:

"Accordingly, the issue before the trial court was whether the appellant was guilty of contempt of the command contained in the subpoena by virtue of his conduct at the October 5 hearing. Manifestly, he was not. Under the doctrine of the Quinn and Bart cases, supra, the appellant could not be found guilty of a wilful default of the subpoena unless, after consideration of his objections to the validity of the subpoena, he was directed to produce the records. But he was not so directed. On the contrary, he was told that he need not produce the records then and there but should produce them within ten days. The appellant replied that he would take that order under consideration. In effect, the order contained in the subpoena was vacated, and a new order substituted. The issue of appellant's compliance with this new order is not involved, since the appellant was neither indicted nor tried for a failure to carry out

---

**2.** Bart v. United States, 1955, 349 U.S. 219, 75 S.Ct. 712, 99 L.Ed. 1016; Quinn v. United States, 1955, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964.

that order. Since there was no direction to produce the records at the hearing, there was consequently no wilful default of the command contained in the subpoena."

 The record not only does not support the purportedly factual statements in the above quotation from appellant's brief, but is directly to the contrary. After consideration of his objections to the validity of the subpoena, Flaxer was unmistakably directed to produce the membership list. He was not told he need not produce the list then and there; the record will be searched in vain for even an intimation to that effect. When Flaxer had completed a lengthy statement of his objections, the following occurred at the hearing:

"Mr. Arens [counsel for the subcommittee]. But you do have the information?

"Mr. Flaxer. In a general sense, I think I have the information.

"Mr. Arens. And you have not complied with the command of the subpena to produce that information.

"Mr. Flaxer. I think it is an improper command, sir.

"Senator Watkins. That is the reason you have refused to bring them here today, because you think it is improper?

"Mr. Flaxer. That is the reason I haven't got them.

"Senator Watkins. That is the main reason. You are directed by the committee to produce those records *according to the terms of the subpena.* [Our emphasis.]³

The Senator could hardly have more clearly directed Flaxer, notwithstanding his objections, to produce the records on October 5. The direction was given in conscious compliance with the requirement of the Quinn and Bart cases, as Senator Watkins knew that Flaxer was unable to obey then and there because he

had deliberately failed to prepare himself to do so. In fact, the witness had already said, "I have no such list with me." We conclude that, since there was an express direction to submit the membership list given after Flaxer's objections had been considered, he could be convicted of violating § 192.

The question is then whether the proof justified the jury's verdict that the appellant was in willful default on October 5. That his contumacy was complete on that day is clearly shown by his own testimony before the subcommittee. He testified he did not bring with him the membership records as the subpoena had commanded. Did he willfully fail to bring them, as the jury concluded? His own words and conduct answer the question in the affirmative. He could have compiled the membership list prior to the hearing, so that he might be ready to obey the subpoena should the subcommittee reject his objections and direct him to produce the records. He deliberately refrained from making the compilation, from which it is apparent that he had decided in advance he would not obey in any circumstances. He stated at the hearing that he regarded "as an improper command" the subpoena's direction that he bring the records. "That is the reason I haven't got them," he said. This was deliberate and defiant contempt of the United States Senate on October 5, 1951.

It was not until after the appellant had been directed, despite his protest, to produce the records according to the terms of the subpoena, that the chairman ordered him to assemble the information and transmit it to the subcommittee in ten days. Obviously this was because the subcommittee still wanted the information which had been contemptuously withheld from it at the hearing. But the chairman nowhere receded from his earlier ruling that the subpoena was to be complied with, which ruling was given after the witness had said he did not have the records with

---

3. Official Reporter's Transcript, page 123.

him. Senator Watkins said nothing which can be construed as excusing or condoning Flaxer's contempt—already complete—in disobeying the subpoena.[4]

If Flaxer had demonstrated good faith by compiling the membership records and sending them to the subcommittee within ten days, perhaps he would not have been indicted for his initial contempt. On that supposition some may think Senator Watkins—although he did not promise immunity in that event—was affording Flaxer an opportunity to purge himself of contempt. If so, it was an opportunity the appellant did not embrace. He remained recalcitrant, thus affirming and emphasizing the contempt he had originally displayed. That he may have committed another contempt in addition to that of October 5 would seem to be irrelevant.

We next consider the appellant's contention that he was entitled to a judgment of acquittal on his theory that a quorum of the subcommittee did not rule upon his objections to the validity of the subpoena. Senate Resolution 366,[5] which established the subcommittee, authorized it to provide that less than a majority should constitute a quorum "for the purpose of administering oaths and taking sworn testimony," and the subcommittee had decided that one member should constitute a quorum for that purpose. Flaxer argues that the authority to administer oaths and take sworn testimony does not include the authority to rule upon the validity of a subpoena.

The power to receive sworn testimony of course includes authority to rule on objections to questions asked the witness. Receiving documents is obviously a normal ancillary to taking testimony. Professor Wigmore says:[6]

"This testimonial duty to attend and disclose all that is needed for the ascertainment of truth applies to *every form and material of evidence* whatever.

"In particular it applies to such evidential material as exists in a person's hands in the form of *documents*. 'There is no difference in principle,' said a great judge [Shaw, C. J., in Bull v. Loveland, 10 Pick. [Mass.] 9, 14 (1830)], 'between compelling a witness to produce a document in his possession, under a subpoena "duces tecum" (in a case where the party calling the witness has a right to the use of such document), and compelling him to give testimony when the facts lie in his own knowledge.' This much is unquestionable; for to give up facts possessed by physical control is no different from the giving up of data possessed as mental impressions."

We think authority to receive sworn testimony includes not only authority to rule on objections to questions but on objections to a subpoena *duces tecum* as well.

In considering appellant's further argument that the pertinency of the membership list called for by the subpoena was not established, it is essential first to ascertain what the subcommittee had been authorized and directed to do, and what it was doing or attempting to do in the hearing of October 5.

The Senate in 1950 authorized and directed its Committee on the Judiciary, or any duly authorized subcommittee, to study and investigate, among other things, the

* * * extent, nature and effects of subversive activities in the United States * * * including but not limited to espionage, sabotage and infiltration by persons who are

---

4. In order to show the sequence of events and what actually happened at the hearing, we reproduce in an appendix to this opinion pertinent portions of Flaxer's testimony before the subcommittee regarding his failure and refusal to obey the subpoena with respect to the membership list.

5. 81st Cong., 2d Sess. (1950).

6. 8 Wigmore, Evidence, § 2193 (3d ed. 1940).

or may be under the domination of the foreign government or organizations controlling the world communist movement or any other movement seeking to overthrow the Government of the United States by force or violence. * * *

The Committee was also directed to study the operation of the Internal Security Act of 1950 and other laws dealing with internal security.[7] In accordance with this authorization and direction there was created, in January, 1951, the Subcommittee on Internal Security.

In § 2 of the Subversive Activities Control Act of 1950 [8] Congress graphically appraised the activities and purposes of the world communist "movement" and concluded that our form of government is in clear and present danger therefrom.[9] It was because of Congressional alarm reflected in that Act and other recent legislation that the subcommittee was authorized to study and investigate the extent, nature and effects of subversive activities, including the infiltration of labor organizations by persons who are or may be under communist domination. Against such a background, the pertinency of the membership list demanded by the subpoena is at once apparent. Cf. Barsky v. United States, 83 U.S.App.D.C. 127, 132, 167 F.2d 241, 246, certiorari denied 1948, 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767; Marshall v. United States, 1949, 85 U.S.App.D.C. 184, 176 F.2d 473, certiorari denied 1950, 339 U.S. 933, 70 S.Ct. 663, 94 L.Ed. 1352. The names could be used to check against a list of subversives to determine the extent of infiltration into the union, a matter clearly pertinent under the Resolution particularly since this is a Government employees' union even though the names

of state and local members are included. Regardless of where they were employed, the names of members were pertinent because an investigation of the union was pertinent.

■ As a final reason for reversal, appellant points out that the indictment charged him with refusing to produce certain records of the United Public Workers of America; that the subpoena served on him in fact called upon him to produce the records of the United Professional Workers of America. This variance, says Flaxer, between the allegation in the indictment and the subpoena actually served on him was in itself fatal to the prosecution and required a judgment of acquittal. The point is frivolous, since Flaxer himself called attention to the inadvertent use of the word "Professional" for the word "Public" in naming the union in the subpoena. He said, "I want to make a minor correction there. Our union is the United Public Workers. * * * Your subpena stated 'Professional Workers.' I recognized it was an error in your identification."

We hold that Flaxer was fairly tried and that his guilt was clearly shown. The judgment pursuant to the verdict must stand.

Affirmed.

### Appendix

Official Reporter's Transcript, pages 113–116:

Mr. Flaxer. * * * The item which I have not produced is the item on membership lists of our union. The demand for the production of this item raises a number of profoundly serious issues. From the very beginning of the union movement in this country, the rights of

---

7. S.Res. 366, 81st Cong., 2d Sess. (1950), S.Res. 198, 82d Cong., 1st Sess. (1951) (continuing S.Res. 366).

8. Title I of the Internal Security Act of 1950, 64 Stat. 987, 50 U.S.C.A. § 781.

9. This was held to dispense with the need for proof—in a deportation case where the question was pertinent—that the Communist Party advocates the violent overthrow of the Government. Galvan v. Press, 1954, 347 U.S. 522, 529–530, 74 S.Ct. 737, 98 L.Ed. 911.

unions to privacy of their membership records—

Mr. Arens. You are reading from a prepared statement?

Mr. Flaxer. Yes.

Mr. Arens. Who prepared the statement?

Mr. Flaxer. I did. (Continues:) Has been one of the basic precepts to which the labor movement of America has adhered. Bitter experience has taught American labor that the right to join a union is an empty right unless the fact of membership can be kept private.

Throughout our history, employers and antilabor groups have attempted to violate the secrecy of union records in order to compile blacklists for the sole purpose of destroying unions. This has been amply documented in the hearings of the La Follette committee. After bitter struggles in and out of the Halls of Congress, labor has succeeded in enacting into law this right of privacy. Countless decisions of the National Labor Relations Board and of our Federal courts have upheld that right. Indeed, the mere query by an employer of an employee as to his union membership has been held to be an unfair labor practice even under the Taft-Hartley Act.

Every individual who joins a union joins it with the confidence and trust supported by tradition and law that the act of joining and maintaining membership is a personal right and freedom that is inviolate. A request such as the present [one] constitutes a wholesale invasion of such privacy and "the right to be let alone" which is protected by the fourth amendment. Every trade-union member imposes a special trust in his union officers to protect and preserve that right. Therefore, to submit to the request in this subpena would be a violation of the trust imposed in me by my member-ship and a betrayal of the entire tradition of the trade-union movement in this country. I have no doubt that not a single union president would find it possible to comply with such a request.

I am confident that the members of this committee, after considering my views and after a study of the full implications of the request made in this subpena, will realize its conflict with the basic union tradition of this country now incorporated into Federal law and withdraw the demand for membership lists.

Mr. Arens. Do you have such a list?

Mr. Flaxer. I have no such list with me.

Mr. Arens. Do the records of the United Professional Workers reflect such a list? Is the information available, in other words?

Mr. Flaxer. I want to make a minor correction there. Our union is the United Public Workers.

Mr. Arens. I meant the United Public Workers.

Mr. Flaxer. Your subpena stated "Professional Workers." I recognized it was an error in your identification.

Mr. Arens. Did the United Public Workers' organization have the information available which is called for in the subpena?

Mr. Flaxer. Well, we generally have such information.

\* \* \* \* \*

Official Reporter's Transcript, pages 122–128:

Mr. Arens. Mr. Chairman, I respectfully ask of the chairman that the witness be ordered to produce for this record, in compliance with the subpena duces tecum served upon him, the record[s] of the United Public Workers who are employed by the Federal Government of the United States of America, and records

showing the names and addresses of all members who are employed by any State, county, or municipal government located anywhere in the United States of America.

Senator Watkins. Do you understand the request made of you?

Mr. Flaxer. Yes; I do.

Senator Watkins. Do you stand on your statement that you refuse to produce those?

Mr. Flaxer. I didn't say I refused. I indicated the situation is such that I find myself incapable of producing them. I think if I complied with a request of that kind, first of all I don't think I have the right either in terms of our membership or in terms of the labor movement generally—

Mr. Arens. But you do have the information?

Mr. Flaxer. In a general sense, I think I have the information.

Mr. Arens. And you have not complied with the command of the subpena to produce that information.

Mr. Flaxer. *I think it is an improper command, sir.*

Senator Watkins. That is the reason you have refused to bring them here today, because you think it is improper?

Mr. Flaxer. *That is the reason I haven't got them.*

Senator Watkins. That is the main reason. *You are directed by the committee to produce those records according to the terms of the subpena.*

Mr. Flaxer. Again I plead with the chairman and with the committee to reconsider the entire matter, because I think you are infringing on a right that workers in America have, including Federal employees. You are the Government. You are the employer. You are as an employer asking for membership lists. You want your own employees to identify themselves as to their trade-union membership. This is something that has not been done in America for the past 10 or 15 years, and where it has been done, it has been condemned as an unfair labor practice. And I just don't believe, sir——

Senator Watkins. As I understand it, you do not claim any rights under the Taft-Hartley Act, because you have not complied with it, and the Government itself, I think, would be entitled to know of its employees whether or not they are members of a union.

Mr. Flaxer. Then I think they ought to ask the employees. I don't think they are entitled to know, sir. I don't think so. I think the Government as an employer ought to adhere to the general national policy on this question. The general national policy on this question is that an employer has no right to ask a union member whether he belongs to an organization even if he tells that union membership that he doesn't even have to tell him [*sic*]. There are cases on record, upheld by the Federal courts of the United States, where the employer is enjoined from asking a person whether he belongs to a union, even though there is no punishment attached to it.

Senator Watkins. I would not argue with you for employees outside of the Government service, or State, county and municipal service. I am not going to argue that question because it is not at issue here. But we have here now an organization made up of people who are working for Government and we are asking you specifically for the names of those who are working for Government. You have that within your information and I do not think there

is any law or any court holding that the United States itself cannot find out the names of a union and the people who belong to it that are in its employ.

Mr. Flaxer. Sir, I don't think the issue has ever come up before.

Senator Watkins. Maybe it has not, but I do not think any court would ever resolve itself against the United States finding out what organization its members belong to.

Mr. Arens. How long would it take you, Mr. Flaxer, to prepare the information which is called for in this subpena?

Mr. Flaxer. I don't know.

Mr. Arens. Could it be done in a week?

Mr. Flaxer. I imagine it could be done in a week.

Mr. Arens. I respectfully suggest to the chairman that the witness be ordered to produce the information and transmit it to the subcommittee in 10 days' time.

Senator Watkins. Since you have made the reply that it could be done in a week, that will be the order of the committee, that you submit that information as requested by counsel for the committee within 10 days from this date. The record will show that you of course have been given that notice and that requirement has been made, and the order has been made.

Mr. Flaxer. I would like to suggest to the committee to reconsider that. I think you ought to consider it in light of the facts that organized labor in America will recognize in this a break in the wall that they have built up over half a century against the initiation of blacklists. I don't think that these lists can be looked upon in any other light than as blacklists.

Mr. Arens. Who is the vice president of the United Public Workers?

Mr. Flaxer. We don't have a vice president.

Mr. Arens. Who are the national officers of the United Public Workers of America?

Mr. Flaxer. I am, and Mr. Ewart Guinier.

Senator Watkins. May I direct your attention to the fact that this is an executive session and the records are not public here unless the order of the committee is to make them public. But at least for the present the records are to be delivered to the committee in executive session.

Mr. Flaxer. Sir, on that I don't see any good purpose that these records would serve, even if I were to produce them. I think they are wholly irrelevant, if you say they are not to be made public.

Senator Watkins. I am not promising you they would not be made public, because I do not think the Government has to make such a promise to get the information.

Mr. Flaxer. I think, with all due respect to the committee, you are infringing here on an area which just crosses the boundaries of individual rights as well as trade-union rights far beyond the contemplation of any——

Senator Watkins. Whatever your argument is, that is the order now, and, as I understand it, you refuse to do so on the ground you set forth. I want to make the record clear.

Mr. Flaxer. I haven't got them. I don't feel capable of producing them.

Senator Watkins. You said you could do it within a week.

Mr. Flaxer. No; that was not the question he asked. He asked could the list be compiled within a week and I said it could.

Mr. Arens. The information is available to you?

Mr. Flaxer. Yes.

Mr. Arens. *But you have declined to produce it; is that correct?*

Mr. Flaxer. *I haven't produced them.*

Mr. Arens. Will you produce it pursuant to the order of the chairman of this session within 10 days from today?

Mr. Flaxer. I will have to take that under consideration.

Senator Watkins. That is the order, and of course we will have to take whatever steps are necessary if at the end of the time you have not produced them.

[All emphasis supplied.]

EDGERTON, Chief Judge, with whom BAZELON, Circuit Judge, concurs (dissenting).

On October 5, the date named in the subpoena, appellant appeared before Senator Watkins, the Chairman of the subcommittee. No other member was present. Appellant produced other records called for by the subpoena, but asked the Chairman to withdraw the demand for membership lists, explaining in effect that he considered the lists privileged. After some discussion the Chairman said: "You are directed by the committee to produce those records according to the terms of the subpoena."

But the Chairman was immediately asked to reconsider this direction. The appellant said: "Again I plead with the chairman and with the committee to reconsider the entire matter, because I think you are infringing on a right that workers in America have, including Federal employees. * * *" The Chairman and the appellant proceeded to discuss the claim of privilege at some length. At the end of this discussion, which occupies a full page of the printed record, the Chairman said, "* * * I do not think any court would ever resolve itself against the United States finding out what organization its members belong to." Mr. Arens, committee counsel, said, "I respectfully suggest to the chairman that the witness be ordered to produce the information and transmit it to the subcommittee in 10 days' time." The Chairman immediately said to the appellant, "Since you have made the reply that it could be done in a week, that will be the order of the committee, that you submit that information as requested by counsel for the committee within 10 days from this date."

This seems to me a clear case of immediate reconsideration of an order followed by immediate substitution of a different order.

After some further discussion, the following colloquy occurred: "Mr. Arens. Will you produce it pursuant to the order of the chairman of this session within 10 days from today? Mr. Flaxer. I will have to take that under consideration. Senator Watkins. That is the order, and of course we will have to take whatever steps are necessary if at the end of the time you have not produced them." The appellant never produced the records.

The indictment did not charge him with failing to produce the records within 10 days from October 5. It charged that appellant "on October 5, 1951 * * * willfully failed and refused to produce the records * * *." The case was tried on that theory alone. This colloquy occurred. "The Court. I expect to tell them to determine it as of the 5th, and that if they find there was no refusal and willful default on that date, that they must find him not guilty even though they believe that he defaulted at some other time. Mr. Hitz [Government counsel]. That's right. I believe that is the law." The court charged the jury: "you are to determine whether on that date, October 5, 1951, the defendant appeared before a subcommittee and then willfully failed and refused to produce the documents and then willfully did make default. If you find that he did not willfully make default at that time and

place—that is, on October 5, 1951—then your verdict would be not guilty, even though you may believe that at some other time that he did willfully default. In other words, the question before you is whether there was a willful default on October 5, 1951, when he appeared before the committee."

In Quinn v. United States, 349 U.S. 155, 165–166, 75 S.Ct. 668, 678, 99 L.Ed. 964, the Court said: "Clearly not every refusal to answer a question propounded by a congressional committee subjects a witness to prosecution under § 192. Thus if he raises an objection to a certain question—for example, lack of pertinency or the privilege against self-incrimination—the committee may sustain the objection and abandon the question, even though the objection might actually be without merit. In such an instance, the witness' refusal to answer is not contumacious, for there is lacking the requisite criminal intent. * * * In short, unless the witness is clearly apprised that the committee demands his answer notwithstanding his objections, there can be no conviction under § 192 for refusal to answer that question." The present appellant was clearly apprised that notwithstanding his objections, the Chairman demanded that he produce the records *within 10 days from October 5*. He was not apprised that, notwithstanding his objections, he must produce the records on October 5. On the contrary, the Chairman made it clear that he need not produce them on that date and production within 10 days from that date would suffice. It follows that here, as in the Quinn case, the District Court should have directed a judgment of acquittal.

The Quinn case—which the Supreme Court had not yet decided—requires reversal for another reason as well. Soon after the hearing before the Chairman began, the present appellant raised an objection to the subpoena. He said: "I produced all the items called for in the subpena except * * * the item on membership lists of our union. The demand for the production of this item raises a number of profoundly serious issues. * * * Every individual who joins a union joins it with the confidence and trust supported by tradition and law that the act of joining and maintaining membership is a personal right and freedom that is inviolate. * * * I am confident that the members of this committee, after considering my views and after a study of the full implications of the request made in this subpena, will realize its conflict with the basic union tradition of this country now incorporated into Federal law and withdraw the demand for membership lists." Appellant was entitled, and in effect asked, to have his objection to the subpoena considered by "this committee", i. e. the subcommittee. It was not so considered. Under Senate rules, the chairman was a quorum "for the purpose of administering oaths and taking sworn testimony", but he was not a quorum for other purposes. The appellant, as soon as he was sworn, objected to the absence of a quorum. In many cases, including this one, the right to a quorum is more than a technicality. A quorum might have accepted appellant's view that the subpoena was invalid. Even if it had not accepted that view, it might have concluded that numbers of union members, not their names, were all that the committee needed, and might therefore as a matter of policy have withdrawn the demand for names.

In my view it is unnecessary to consider appellant's contention that the demanded records, particularly as to non-federal employees, were not pertinent to the committee's authorized investigation.

FAHY, Circuit Judge, dissents on the ground that the Subcommittee had empowered a single member only to administer oaths and to take sworn testimony and this power was not broad enough to include authority in but one member to rule upon objections to the production of documents called for by a subpoena *duces tecum*.