Estelle Wyler v. Commissioner.
Wyler v. Commissioner
Docket No. 2245-62.
United States Tax Court
T.C. Memo 1964-203; 1964 Tax Ct. Memo LEXIS 134; 23 T.C.M. (CCH) 1226; T.C.M. (RIA) 64203; 65-1 U.S. Tax Cas. (CCH) P9371; July 29, 1964
Nathan J. Willner, for the petitioner. John B. Murray, Jr., for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion MURDOCK, Judge: The Commissioner determined a deficiency of $4,589.82 in income tax of the petitioner for 1959. The errors assigned are the action of the Commissioner in disallowing "Legal and accounting fees" of $9,775 and "Travel and entertainment" of $1,675, deducted on the return. Findings of Fact The petitioner filed her individual income tax return for 1959 with the director of internal revenue for the district of Manhattan, New York. The petitioner reported on her return for 1959 as salary $20,800 *135 from Estelle Wyler, Inc., from which she deducted $1,800 representing "Dues & Subscriptions for Stylists - $125" and "Travel and Entertainment to secure ideas at exhibits, art shows and Stylists shows based upon $5 a day - $1,675." The Commissioner, in determining the deficiency, disallowed the $1,675 item for failure to show that it was incurred and paid and that it was a proper deduction under either section 162 or section 212 of the Internal Revenue Code of 1954. The petitioner, on that return, deducted $9,775 under "Other Deductions" listed as "Legal & Audit Fees paid in Stockholders action Joseph Hogan, Esq.
$4,500
Sidney Gaines, Esq.
2,500
Alferd E. E. Santangelo, Esq.
1,250
Certified Public Accountants
1,575." The Commissioner, in determining the deficiency, disallowed the amount claimed for the reason that it was not "substantiated to be proper deductions within the purview of either sections 162 or 212 of the Internal Revenue Code of 1954." Estelle Wyler, Inc., is a corporation engaged in operating a beauty salon on one of the upper floors at 724 Fifth Avenue, New York. Its officers and equal owners *136 of all of its stock during its fiscal year ended September 30, 1959 were the petitioner, Estelle Wyler, President, and Harriet Kraus, Secretary-Treasurer. Each worked full time and received a salary of $20,800. Harriet had charge of the books and management. Estelle was in charge of the services to customers and the training of operators. The corporate return for the fiscal year reported gross sales of $278,421.53; net taxable income of $752.56; and $225.77 as tax due. The corporation did not authorize, pay or deduct any travel or entertainment expense at any time material hereto. Its balance sheet showed capital stock of $2,000 and earned surplus of $26,871.61 at the beginning and $27,262.01 at the end of its 1959 fiscal year. The record does not show that the petitioner paid any amount as travel expense incident to the carrying on of any trade or business. The record does not show that any amount which the petitioner may have spent for alleged entertainment during 1959 was an ordinary or necessary expense of carrying on the business of Estelle Wyler, Inc., or of carrying on any trade or business of the petitioner. The business relations between Harriet and the petitioner *137 became strained early in 1959. The petitioner became suspicious of Harriet and suspected that Harriet was misappropriating funds of the corporation. Harriet denied that she had misappropriated any funds. No civil or criminal action was instituted against her. The petitioner in 1959 employed Joseph Hogan, a lawyer in New York; told him of her suspicions; asked his advice; paid him $2,250; became dissatisfied with him as her lawyer; and took her troubles to another law firm. Hogan had an accountant go over the records of the corporation and was attempting to negotiate a settlement by purchasing Harriet's stock in the corporation when the petitioner changed attorneys. The second firm consulted by the petitioner in 1959 included Sidney Gaines and Norbert Ruttenberg. It received $1,500 in fees from the petitioner in 1959. It took the information it had to the New York District Attorney's office, with the thought that Harriet could be prosecuted criminally. The office of the District Attorney believed that no crime had been committed and refused to prosecute. The Gaines firm then studied the question of a civil case against Harriet but the petitioner took the matter out of its hands *138 and employed Santangelo, another attorney. The petitioner paid Santangelo $1,250 in 1959. The latter had first to file a motion in court to obtain the petitioner's papers from Gaines, who was holding them for his fee. The amount of the fee was compromised and paid. Santangelo then tried to have the District Attorney bring a criminal action against Harriet but was unsuccessful. He then tried to get Harriet to sell her stock to the petitioner and a sale resulted in 1960 under which the petitioner acquired all of Harriet's stock. The petitioner also paid Nathan J. Willner, a Certified Public Accountant, $1,250 in 1959 to examine the books of the corporation and advise her while Santangelo was acting as her attorney and attempting to buy Harriet's stock. Opinion Counsel for the petitioner argues on subjects not before the Court, relies upon matters not proven as facts and more than once states supposed facts which are directly contrary to facts established by the evidence. Briefs of that kind are not particularly helpful and require no detailed discussion. The $1,675 is claimed on the return as "Travel and Entertainment to secure ideas at exhibits, art shows and Stylists shows *139 based upon $5 a day." There is no evidence in the record to show that the petitioner spent any money in 1959 for travel or to secure ideas at exhibits, art shows or stylists' shows. The petitioner testified that she entertained "a lot of theatrical people at one time" but she never further identified any person involved or mentioned when the entertainment took place. She said that the entertaining of theatrical people and friends was "to keep their friendship and keep them as customers." The entertainment consisted of drinks, cold cuts and delicacies served to "the people that come to the house." Thirty-four checks, all stated to be endorsed by Morris Lourie, and all dated in 1959, were admitted in evidence as petitioner's Exhibit 1. Four of the checks were not endorsed by Lourie, were not explained otherwise and are not properly a part of the exhibit. The remaining 30 checks are all endorsed"Morris Lourie, Inc." Lourie operated a liquor store at which the petitioner purchased some liquor in 1959. Twenty-one of the checks were made to "Cash." Nine were made to Lourie. Eighteen of the "Cash" and 2 of the Lourie checks were for $6, $10, $15 or $20. The total amount of the 30 checks *140 was $440.16. There is no evidence of how much of this amount was actually paid for liquor or how much, if any, was paid for liquor served by the petitioner to others. The petitioner's Exhibit 2, consisting of 45 checks dated in 1959, was admitted on the statement that the checks were all endorsed is not properly a part of the exhibit. The other 44 checks are by Pembroke Delicatessen. One, for $75.75, was not so endorsed, was not otherwise identified or explained and is not properly a part of the exhibit. The other 44 checks are made payable to cash in the total amount of $765.04. Thirty-nine checks are for round sums ranging from $10 to $50. The amounts of the other 5 are: $7.35, $8.92, $18.07, $23.08 and $52.62. Twenty are endorsed first by Mildred Jones and second by Pembroke. The others are all first endorsed by Pembroke. Mildred Jones was employed in the building where the petitioner lived. She cleaned the petitioner's apartment on two days a week and was paid $5 per week by the petitioner. The petitioner was unable to explain why Mildred endorsed the checks except to say that she sometimes sent Mildred to the store. There is no evidence of how much of the $765.04 was actually *141 paid for food or how much, if any, of it was paid for food served by the petitioner to others. The checks endorsed by Lourie amount to $440.16 and those endorsed by the delicatessen amount to $765.04, or a total of only $1,205.20 of the total of $1,675 claimed on the return. The evidence on this issue is too general and vague to justify any change in the determination of the Commissioner. It is not at all apparent that the petitioner had any deductible entertainment expenses. The petitioner claimed deductions totalling $9,775 for "Legal & Audit Fees paid in Stockholders action" but the evidence does not show payments of more than $6,250. Why she twice changed lawyers, just what benefits she hoped to obtain other than to purchase Harriet's stock, what, if anything, improper Harriet had done and why the petitioner paid out so much in fees is not clear from the record. The only result was that she finally followed the advice given by Hogan and Santangelo, to buy Harriet's stock. The record is clear that the petitioner became the sole owner of all of the stock of the corporation. A joint arrangement for the operation of the business was then made with another corporation. The record *142 does not justify any finding that would entitle the petitioner to deduct all or any part of the $6,250 in 1959 under any provision 9 of the Internal Revenue Code. Some of it, perhaps all of it, may have been a capital expenditure related to the stock she held or later acquired, or to both. Cf. Chestnut Farms Dairy, Inc., 19 B.T.A. 192, 198, affd. 63 F. 2d 129; Joseph Lewis, 27 T.C. 158, affd. 235 F. 2d 821. The petitioner has not shown that the Commissioner erred in disallowing the deduction. Decision will be entered for the respondent.